**George J. BITZES, Jr., Plaintiff and Appellant,**

v.

**SUNSET OAKS, INC., Defendant and Respondent.**

No. 17479.

Supreme Court of Utah.

June 25, 1982.

B. L. Dart, John D. Parken, Dart & Stegall, Salt Lake City, for plaintiff and appellant.

Steven H. Stewart, Stewart, Paxton & Russell, Salt Lake City, for defendant and respondent.

DURHAM, Justice:

Plaintiff/appellant, George J. Bitzes, Jr. (appellant), entered into an agreement in 1977 for an option to purchase a lot on property to be subdivided and developed by defendant/respondent, Sunset Oaks, Inc. (respondent). Appellant filed this action seeking specific enforcement of the option agreement or, in the alternative, appropriate damages. Appellant prevailed and was awarded $5,000 in damages by the trial court, which amount he claims is inappropriate and is the subject of his appeal. On cross-appeal, respondent claims that it should have prevailed based on its defense of "impossibility of performance." We hold that the trial court correctly rejected respondent's "impossibility of performance" defense, but we further hold that the trial court erred in the amount of its award of damages to the appellant.

I

Respondent is the developer of a subdivision known as Sunset Oaks. In October of 1977, appellant and respondent entered into an option agreement in which it was stated that appellant desired "to purchase a future lot to be located directly east and adjacent to lot 19/20 of Sunset Oaks Plat 'A,' to be known as Lot 11 Plat 'B,' which consists of approximately 10,655 sq. ft." Appellant paid a consideration of $100 and further agreed that the option was to be exercised by the signing of an earnest money agreement for a sale price of $45,200 within 30 days from the date Sunset Oaks Plat "B" was recorded. At the time the option agreement was signed, Plat "A" had been approved and recorded and a tentative drawing for Plat "B" was available and examined by both parties.

When the tentative map for Plat "B" was presented to Salt Lake City officials, neighborhood opposition arose to the overall development and focused on potential drainage problems and certain street designs. City officials also expressed concern over the failure to include certain drainage easements in the proposed plat. In light of these obstacles, respondent decided to incorporate the third phase of development, Plat "C," into a single second phase with Plat "B." Salt Lake City required the placement of a thirty foot drainage easement on the northern portion of lot 11, as identified in the preliminary plat maps. The respondent then decided to change the southern and eastern boundaries of Lot 11 so that the easement ran down the northern edge of the lot and a larger contiguous area remained in the lot for construction. With the merger of the second and third phases into Plat "B," a new lot numbering system was used and the bulk of the area originally encompassed within lot 11 now became lot 26. The map for Plat "B" incorporating these changes was approved by Salt Lake City and formally recorded in June of 1979. The approval for Plat "B" took some 30 months, while the approval of Plat "A" had taken approximately 12 months.

In the summer of 1978, appellant and respondent exchanged letters. Respondent advised appellant that the option agreement had failed for impossibility because they were now dealing with a completely different proposed plat and changed lot

numbers, sizes and prices. Appellant refused to accept a return of the $100 consideration and said that he intended to complete the transaction as set out in the option agreement. After Plat "B" was recorded in June of 1979, another exchange of correspondence occurred in which appellant wrote to the respondent requesting that sale of the lot proceed. Respondent refused to proceed and this litigation was instigated by the appellant. Appellant originally sought specific performance but has since limited his claim to one for damages.

## II

We shall first examine respondent's defense of impossibility of performance. Respondent claims that the lot mentioned in appellant's option ceased to exist through no fault of the respondent. The appellant's option was conditioned upon the approval and recording of a Plat "B" containing a lot directly east and adjacent to lot 19/20 of Plat "A" known as lot 11, and nothing more. Therefore, respondent claims, the continued existence of lot 11 as mapped out in the initial proposal was a condition precedent to the appellant's option. Lot 26 in the approved plat, although located directly east and adjacent to lot 19/20 of Plat "A," had a different configuration, had a different lot number and contained 12,600 sq. ft., rather than 10,655 sq. ft.

The trial court entered a finding of fact that "[t]he essential location, view, size and value of the parcel originally designated to plaintiff as 'lot 11' remained unchanged, although it was redesignated by defendant [respondent] as 'lot 26.'" An independent real estate appraiser, called by the appellant, testified that the drainage easement covered 3,800 square feet of the new lot 26. It had 1,500 square feet less usable land than the original lot 11. As a result, according to the appraiser, there was very little difference in value between lot 11 without an easement and the larger lot 26 with the drainage easement. The court further found that the decision to change the configuration and designate the property in issue as lot 26 was solely that of

respondent and that no statute, ordinance, governmental rule or regulation prevented respondent from conveying to the appellant the property originally referred to as lot 11. These findings are supported by substantial and competent evidence in record and we will not disturb them. *Fisher v. Taylor*, Utah, 572 P.2d 393 (1977). The trial court in its conclusions of law stated:

It was neither objectively nor legally impossible for defendant to perform its contract with plaintiff; any increased difficulty of performance was caused by the voluntary and collateral acts and decisions of defendant and, at most, rendered the contract more expensive and less profitable to the defendant.

One of the earliest statements of this Court on the availability of the defense of impossibility of performance in a contract action is found in *McKay v. Barnett*, 21 Utah 239, 60 P. 1100 (1900):

Where the contract is to do acts which can be performed, nothing but the act of God or the public enemy, or the interdiction of the law as a direct and sole cause of the failure, will excuse the performance. This principle is elementary.

21 Utah at 247, 60 P. at 1102. This statement was in keeping with the strict application of the impossibility defense prevalent in the early part of this century. A more liberal application of the impossibility defense has found favor among the courts in many jurisdictions in recent years. *See generally*, Annot., 84 A.L.R.2d 12 (1962). A more recent formulation of the doctrine by this Court can be found in *Holmgren v. Utah-Idaho Sugar Co.*, Utah, 582 P.2d 856, 861 (1978):

The doctrine of impossibility of performance is one by which a party may be relieved of performing an obligation under a contract where supervening events, unforeseeable at the time the contract is made, render the performance of the contract impossible.

Contemporary formulations of the doctrine of "impossibility of performance" are often identified by the phrases "impracticality of performance," *Restatement*

*(Second) of Contracts* § 261 (1979); Uniform Commercial Code § 2–615; § 70A–2–615, U.C.A., 1980; 6 Corbin, *Contracts* §§ 1337–39 (1962); 18 Williston, *Contracts* §§ 1946–51 (3d ed. 1978), and "frustration of purpose," *Restatement (Second) of Contracts* § 265 (1979); 6 Corbin, *Contracts* §§ 1322, 1323, ch. 77 (1962 & Supp.1980); 18 Williston, *Contracts* § 1954 (3d ed. 1978). Respondent specifically claims that the purpose of this contract was frustrated by the failure of Salt Lake City to approve the preliminary proposal for Plat "B."

*Castagno v. Church*, Utah, 552 P.2d 1282 (1976), involved the issue of frustration of purpose and is instructive in examining the instant case. Church agreed to sell Castagno 40 acres of land and all water rights to a well located on the property. Upon payment of half the purchase price, 20 acres were conveyed and Castagno was granted the right to use the water from the well which was located on the unconveyed 20-acre parcel. The state engineer ordered Castagno to cease using the well and Church was subsequently unable to procure water rights for the well. Upon a petition for specific performance, the trial court ordered Church to convey the remaining 20 acres to Castagno with a rebate of $12,000 on the purchase price as representing the value of the water which was no longer available. Church pled the doctrine of frustration of purpose as a defense to the claim for specific performance. This Court adopted the following language from a California case in discussing the doctrine of frustration of performance:

> The courts have required a promissor seeking to excuse himself from performance of his obligations to prove that the risk of the frustrating event was not reasonably foreseeable and that the value of counterperformance is totally or nearly totally destroyed, for frustration is no defense if it was foreseeable or controllable by the promissor, or if counterperformance remains valuable.

552 P.2d at 1284. This statement is consistent with the doctrine of frustration of purpose as set out in *Restatement (Second) of Contracts* § 265 (1979). The following explanation is found in comment a. of § 265:

The rule stated in this Section sets out the requirements for the discharge of that party's duty. First, the purpose that is frustrated must have been a principal purpose of that party in making the contract. ... Second, the frustration must be substantial. It is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss .... Third, the nonoccurrence of the frustrating event must have been a basic assumption on which the contract was made.

We upheld Castagno's claim of specific performance based on the fact that at the time of the execution of the contract Church knew there were no existing water rights to the well. We said:

> They [Church] undertook the duty to procure such a right, but they made no provision in the contract to excuse them, if the State Engineer did not grant their change application to divert a water right to the well. Furthermore, the basis of the contract, the conveyance of 40 acres of land, may not be deemed frustrated merely because the defendants were unable to convey the water right.

552 P.2d at 1284.

In the case before us, the basic purpose of this option agreement may not be deemed frustrated because of changes voluntarily made in the plat map by the respondent. The contract was for an option to buy a parcel of real estate, not for etchings on a plat map. The real property was still available for sale and could be fairly identified in terms of the contract as that piece of property immediately east of lot 19/20 of Plat "A." The voluntary changing of a designation on the Plat "B" map from lot 11 to lot number 26, and the minor changes in the configuration do not impair the ability or duty of the respondent to meet its obligations under the contract. As discussed above, substantial evidence in the record supports the trial court's finding of fact that the two lots had essentially the same location, view, size and value. The

delays in final approval of Plat "B" caused by neighborhood opposition and governmental review and the alterations in the plat map mandated by the city are contingencies the respondent, as an experienced real estate developer, could have foreseen and covered in the contract. In addition, occurrence of these events does not so substantially frustrate the respondent's purpose of selling lots in the subdivision that it is relieved of its obligations to convey the property which is the subject of this option agreement, even if performance of the agreement leads to a substantially less profitable transaction than originally anticipated.

### III

█ The respondent also argues that even if there was a breach of the contract on its part, the appellant is not entitled to any damages because he failed to fulfill his obligation under the option agreement to enter into an earnest money agreement within the 30-day period subsequent to the recording of the plat map. The trial court found that the appellant tendered full payment during the 30-day period and that any other actions would have been unavailing. The record shows that subsequent to the exchange of letters in 1978 noted in part I, supra, a meeting was held between the appellant and respondent. The respondent offered to sell a lot for $63,000 and the appellant refused to abandon the original agreement. Appellant discovered on June 30, 1979 from a newspaper ad that lots in the subdivision were for sale and wrote a letter to the respondent on July 6, 1979 restating his commitment to the original agreement. He further stated that "unless we can reach an agreement to close at the agreed upon price of $45,200 by July 16, I will proceed with the appropriate legal action." Appellant received a letter dated July 17, 1979 from an attorney for the respondent acknowledging the receipt of the July 6, 1979 letter and stating: "As you proceed with appropriate legal action would you kindly inform your counsel I would be happy to accept service of summons and complaint on behalf of development associates."

*Restatement (Second) of Contracts* § 250(a) (1979) defines a repudiation:

[A] statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach under § 243 . . . .

The effect of a repudiation is set out in § 253(1):

Where an obligor repudiates a duty before he has committed a breach by nonperformance and before he has received all of the agreed exchange for it, his repudiation alone gives rise to a claim for damages for total breach.

The respondent's letter in 1978 claiming that the agreement failed for impossibility and the subsequent meeting with the appellant in which a lot price of $63,000 was offered may together constitute a repudiation. Certainly those events created a situation in which the appellant was entitled to doubt the intent of the respondent to proceed with the contract. *Restatement (Second) of Contracts* § 251(2) (1979) provides:

The obligee may treat as a repudiation the obligor's failure to provide within a reasonable time such assurance of due performance as is adequate in the circumstances of the particular case.

The appellant had the right, under the circumstances of this case, to demand assurances before proceeding with his obligations under the contract. Appellant's letter of July 6, 1979 was such a demand for such assurances. The respondent's answer through its attorney inviting a lawsuit is certainly a failure to provide any assurance of due performance. We therefore hold that respondent repudiated the contract and that the appellant was not required to make a futile attempt to negotiate or execute an earnest money agreement. Total breach by the respondent occurred in July of 1979 and the appellant was entitled to pursue his legal remedies.

### IV

█ The final question we face is raised by the appellant and concerns the appropri-

ate measure of damages. Appellant claims the trial court literally "pulled out of the air" the $5,000 figure awarded as damages. The court stated in its memorandum decision that the agreement between the parties "was not an agreement for purchase when the subdivision was approved and that the plaintiff should therefore be awarded damages in the sum of $5,000 plus interest." This indicates that the court distinguished the option agreement from a standard real estate contract. If this were a real estate contract, the usual measure of damage would be the appellant's benefit of the bargain with reference to the contract price and the market value of the property at the time of the breach. *Beckstrom v. Beckstrom*, Utah, 578 P.2d 520 (1978); *Smith v. Warr*, Utah, 564 P.2d 771 (1977).

An independent real estate appraiser, called by the appellant, testified that if the configuration of lot 11 remained unchanged and the drainage easement required by the city had been drawn through the lot, the value of lot 11 would have been decreased by approximately $5,800. There is also testimony that the appellant and respondent did not discuss the possibility of any easements through lot 11 and the original plat map examined by the appellant gave no indication that any such easements might be imposed. Apparently, the trial court took as its approximate measure of damages the devaluation in lot 11, as originally platted, caused by the drainage easement.

The question of the appropriate measure of damages in the breach of an option agreement has been infrequently before this Court. In *Gardner v. Christensen*, Utah, 622 P.2d 782 (1980), we upheld the trial court's determination of the market value of the subject property, approving by inference the court's calculation of damages based on the difference between the contract price and the market value of the property at the time of the breach. In *Ranch Homes, Inc. v. Greater Park City Corp.*, Utah, 592 P.2d 620 (1979), we were asked to determine the legality of an award of special damages allegedly incurred by the plaintiff in reliance upon an option contract. In reference to general damages the court said:

The term "general damages," as applied to the instant case, denotes those damages which in the usual course of things flow from the breach. They are of course limited to those resulting from the ordinary and obvious purpose of the contract which in the case at hand would be the "loss of the bargain" represented by the difference between the market value of the land and the option price.

592 P.2d at 624.

■ This statement is consistent with the holding of the court in *Ranch Homes* concerning special damages. The court said that "[i]f a breach occurs, the party at fault is liable only for those expenditures that could reasonably have been foreseen as a consequence of the breach and which were reasonably incurred by the innocent party." *Ranch Homes, supra,* at 625. In a time of rising market values, the parties in this case could reasonably foresee that the optionee for the purchase of real estate at a set price would forego purchasing other property at the then current market price in anticipation of exercising his option for the lower price available to him under the option agreement. Likewise, it was certainly foreseeable that if market values dropped, the optionee would decline to exercise the option, purchase other property at a lower price and suffer the loss of the $100 consideration for the option agreement. This is the very nature of the benefit sought and the risk incurred by the parties in entering into such an agreement. We hold that under an option agreement for the purchase of real estate, if the optionor/vendor repudiates the agreement, the measure of damages for the optionee/purchaser is the benefit of his bargain, *i.e.*, the difference between the market price and the contract price at the time of the breach.

■ The determination of the trial court on damages will not be reversed if it is supported by substantial evidence in the record. We will, however, reverse the trial court if there is a misapplication of the law to the established facts. *Hardy v. Hen-*

*drickson,* 27 Utah 2d 251, 495 P.2d 28 (1972). The appraiser called by the appellant testified that the value of lot 26 in July of 1979, the time of the respondent's repudiation of the contract, was $63,900. The president of Sunset Oaks, Inc., testifying for the respondent, agreed that was a fair valuation of the property at that time. The purchase price of the property under the option agreement was $45,200. The trial court's judgment of $5,000 in behalf of the appellant is reversed and the case is remanded with instructions to enter judgment in behalf of the appellant/plaintiff in the amount of $18,700 plus interest and costs.

Reversed and remanded. No costs awarded on appeal.

HALL, C. J., and STEWART, OAKS and HOWE, JJ., concur.