IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| Daniel M. Smargon and Audrey M. Viterbi, | ) | OPINION |
| | ) | |
| | ) | Case No. 20110059-CA |
| Plaintiffs and Appellees, | ) | |
| | ) | |
| v. | ) | F I L E D |
| | ) | (October 25, 2012) |
| Grand Lodge Partners, LLC; and Jack Koson, | ) | |
| | ) | 2012 UT App 305 |
| | ) | |
| Defendant and Appellant. | ) | |

-----

Third District, Silver Summit Department, 070500572
The Honorable Keith A. Kelly
The Honorable Bruce C. Lubeck

Attorneys:      Joseph E. Wrona, Draper, and Todd D. Wakefield, Park City, for
                Appellant
                James S. Lowrie and Nathan D. Thomas, Salt Lake City, for Appellees

-----

Before Judges Davis, Thorne, and Roth.

ROTH, Judge:

¶1      Defendant Grand Lodge Partners, LLC (GLP) appeals from the district court's grant of summary judgment and subsequent award of damages to Plaintiffs Daniel M. Smargon and Audrey M. Viterbi (the Smargons). We affirm.

BACKGROUND

¶2      In February 2005, the Smargons entered into a contract (the Contract) with GLP for the purchase of a resort condominium unit (the Unit) near Park City, Utah.  At the time of contracting, construction had not yet begun on the condominium development. Pursuant to the Contract, the Smargons paid GLP an option payment of $154,900 to reserve the Unit.

¶3      In March 2005, the Smargons reviewed the plans for the project and became aware that a mechanical room would be located across the hall from the Unit.  The mechanical room would house a large chiller that would provide climate control for the development.  The Smargons voiced concerns to GLP about the location of the mechanical room and the disturbance it could create in the Unit.  GLP responded by letter on March 9, 2005, writing that "[it] w[ould] make every effort to mitigate the noise through insulation and extra construction methods to ensure that the noise is reduced to an acceptable level."  The Smargons then let pass a time-limited option to rescind the Contract and paid GLP an additional $154,900 as an earnest money deposit.  In the months that followed, the Smargons spent $92,717.17 to make several upgrades to the Unit, including, among other things, the installation of an exterior door and custom flooring and countertops.  Eventually, a closing date was set for August 10, 2007, and the Smargons wired the balance of the $1,549,000 purchase price into escrow in anticipation.

¶4      On August 9, the day before the scheduled closing, the Smargons conducted a walk-through inspection of the Unit.  The walk-through inspection was an option provided to the buyer under the Contract, which, as GLP put it, would permit the Smargons to create a "punch list" of needed repair work.  Specifically, the Contract stated that the Smargons "may conduct a 'walk-through inspection' of the . . . Unit . . . . for the purpose of identifying any corrective or repair work . . . that needs to be completed to achieve substantial completion of the . . . Unit."  The Smargons began the inspection by noting a problem with the custom flooring, which they marked with blue tape.  The walk-through was soon disrupted, however, by noise and vibration emanating from the equipment in the mechanical room.  As a result, the Smargons cut short the inspection and did not complete a punch list of needed repair work.

¶5     Because of the mechanical room problem, the Smargons did not attend the scheduled closing the next day.  GLP contacted the Smargons later in the day, acknowledged the noise and vibration in the Unit, and apparently conceded that, under the circumstances, it did not expect the Smargons to close on the Unit at that time. Nevertheless, GLP requested that they complete a punch list to address needed repair work, including the noise and vibration problem.  The Smargons declined to do so because they did not believe that the mechanical room problem was appropriately addressed as a punch list item.

¶6     Over the next month, the parties contacted each other to discuss the noise and vibration in the Unit and the Smargons' obligation to close on the Contract under the circumstances.  In the course of these discussions, the Smargons took the position that if they decided not to purchase the Unit, GLP should refund both their option payment and earnest money deposit, as well as the amount they had spent to upgrade the Unit. They also requested that GLP pay them the substantial appreciation in the value of the Unit from the date the Contract was executed to the date scheduled for closing, reasoning that they had missed the opportunity to purchase a comparable unit in this or another condominium development when such units were similarly priced.  During this time period, GLP sent an email and two letters to the Smargons on August 20, 2007, August 29, 2007, and September 6, 2007 (collectively, the letters).  The legal effect of these letters has become one of the main focuses of the dispute.

¶7     In the August 20 email, GLP acknowledged the noise and vibration in the Unit caused by the equipment in the mechanical room.  GLP explained that the problem was caused by "unusual circumstances present when [the Smargons] were [in the Unit for the walk-through inspection] but" asserted that "the sound levels are, under normal conditions, much lower than you heard."  GLP described some specific actions it "might do to further reduce the noise levels," such as to "put in spring isolators and dampers under the chiller," "put a sound blanket on the chiller," and "put isolators at pipe wall penetrations."  GLP asserted that these actions "should greatly reduce the noise," and it "expect[ed] better than industry standards verifiable by acoustical instruments."  GLP also asserted, "[W]e feel we have an enforceable contract.  I am sorry about how you felt about the condition of your condominium but even with the . . . things needing punchlist attention, the unit was as the contract specified."  According to GLP, "[a]ll the issues . . . raised would be taken care of in a usual punchlist process."  Nevertheless,

GLP offered the Smargons the option to either proceed with closing or be "refund[ed] [their] deposit" and reimbursed what they had paid for modifications to the Unit.

¶8      On August 29, GLP again wrote to the Smargons, stating that it "would like to resolve the issue of your condominium as soon as possible" but also expressing the view that GLP was "on firm ground and that you are now technically in default." With regard to the mechanical room problem, GLP explained that "[s]ome aspects of the noise . . . have been mitigated and further steps are being taken." GLP then reiterated its prior offer "to release you from [the] contract and refund both [the] deposit and the monies . . . spent to modify" the Unit. However, GLP stated that it would not pay the Smargons the appreciation in value of the Unit. The letter gave the Smargons until September 7, 2007, to accept one of the options GLP had offered or it would "consider [them] in default with all the consequences that such condition warrants." GLP expressed regret for the letter's "litigious tone," but explained that it had "spoken to our attorney and he feels we are on extremely firm ground in our position" and "he feels that we do not need to make our generous offer of releasing you from your obligations and returning your money." GLP also pointed out that, under the Contract, "the loser in any litigation will pay for the legal cost of the prevailing party so we feel totally confident in what we have proposed herein."

¶9      About a week later, on September 6, GLP sent a final letter to the Smargons, written by its attorney, asserting that GLP "ha[d] performed its obligations under" the Contract, but "[t]he Smargons failed to close on the purchase of the unit [on August 10] pursuant to the terms of the purchase contract and have thereby defaulted on their obligations under that contract." GLP also asserted that, "[r]ather than closing on the unit as required by the contract," the Smargons had "attempted to impose upon [GLP] other demands and requirements not provided for in the contract, such as returning . . . option money, paying interest and paying additional sums . . . , all based on [their] apparent dislike of the unit because of sound that originates in a nearby mechanical room, which [they] believe[] will be bothersome." GLP then explained that the Smargons' "concerns would have been addressed through the punch list procedure provided for in the contract." According to GLP, it was "confident that [it] delivered a unit that meets or exceeds any applicable industry standards," had "taken additional measures to reduce any possible sound from the mechanical room," and had "made significant efforts to resolve the Smargon[s'] concerns." GLP then reiterated its offer to either refund the Smargons their "option money" and the monies paid to upgrade the

Unit or allow the Smargons to close on the Contract, though specifying that the option to close must be accepted by performance. GLP also required that "acceptance of either . . . offer[] must also be accompanied by a signed full release of any potential claims by the Smargons." GLP explained that it did "not believe that [it] has the legal obligation to do any of these things for the Smargons" because they had "defaulted by not closing and that [GLP] has the right, as one of their various remedies under the contract, to unilaterally terminate the contract, keep all option money or other money paid by the Smargons and resell the unit with no further obligation to the Smargons." The letter gave the Smargons until the next day, September 7, 2007 at 5:00 p.m. to accept one of the options, warning that if they did not do so, GLP would "consider the contract terminated, with no further obligations to the Smargons" and would "retain all money paid by the Smargons pursuant to the terms of the contract and . . . remarket and resell the unit."[1]

¶10    The Smargons responded in writing that same day, indicating their interest in "resolving th[e] problem in a fair and equitable way" but explaining that the impending twenty-four-hour deadline imposed by GLP was "not conducive to that exercise." The Smargons did not accept either of GLP's alternative offers, apparently because they had determined by this time that they no longer wanted to purchase the Unit due to concerns about the noise and vibration and could not reach an agreement with GLP on the amount GLP should pay them to terminate the Contract. *See infra* ¶ 24 n.5.

¶11    The Smargons filed a complaint against GLP alleging breach of contract, and GLP counterclaimed for breach of contract, as well. Both parties moved for summary judgment. The district court granted the Smargons' motion for summary judgment and denied GLP's cross-motion, concluding that GLP had repudiated the Contract and was therefore in breach. The district court reasoned that GLP had "modified the Contract by promising to make every effort to ensure the noise levels in the Unit would be at an

---

1. After the walk-through inspection, GLP consulted with its architects and sound engineers about how to address the noise and vibration in the Unit caused by the equipment in the mechanical room. During the ensuing litigation, GLP also explained that in a newly-constructed condominium development, chillers such as the one in the mechanical room would take time to "balance" and in the interim could cause some noise. It appears from the record that by December 2007, the noise and vibration issues had not been remedied, but by July 2008, noise levels met industry standards.

acceptable level" and that on the day before closing, GLP "had not kept its end of the bargain." The district court concluded that GLP then failed to provide adequate assurances to the Smargons that it would perform as required under the Contract.

¶12   A bench trial was later held to determine damages for GLP's breach. The Contract provided that in the event of GLP's default, the Smargons were entitled to "a refund of the Earnest Money Deposit plus interest" and "an amount equal to the amount of the Option Payment." Pursuant to this liquidated damages provision, the court awarded the Smargons their option payment and earnest money deposit with applicable interest. The Smargons also requested expectancy damages for the appreciation in value of the Unit from the date of the Contract to the date of the scheduled closing. The court concluded, however, that such an award was barred by the Contract's liquidated damages provision because such damages were "incapable or very difficult of accurate estimation at the time of execution of the contract." Nevertheless, despite the liquidated damages provision, the court awarded the Smargons reliance damages to compensate them for the amount they had paid for upgrades to the Unit. The court reasoned that "at the time of contract formation" GLP knew "that it would allow buyers of condominium units to make change order upgrades," and the liquidated damages provision did not provide "just compensation" for those upgrades in the event of GLP's default despite the amount being "capable of accurate estimation."

¶13   GLP appeals.


ISSUES AND STANDARDS OF REVIEW

¶14   GLP challenges the district court's grant of summary judgment. Summary judgment is appropriate only if "there is no genuine issue as to any material fact and [if] the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). "A district court's decision to grant summary judgment is reviewed for correctness, with no deference afforded to the district court." *Oman v. Davis Sch. Dist.*, 2008 UT 70, ¶ 14, 194 P.3d 956 (internal quotation marks omitted).

¶15   GLP also contests the district court's award of damages, specifically challenging the court's decision to award reliance damages to the Smargons. We construe GLP's

argument as presenting a question as to whether the court applied the correct legal standard, a matter that we review for correctness. *See Chen v. Stewart*, 2004 UT 82, ¶ 19, 100 P.3d 1177 ("[W]hether the trial court applied the proper legal standards is a question of law that is reviewed for correctness.").

ANALYSIS

I. Summary Judgment

¶16    On appeal, GLP asserts that the district court erred in two respects when it granted summary judgment to the Smargons. First, GLP argues that the court inappropriately concluded as a matter of law that GLP had repudiated the Contract. Second, GLP argues that the Smargons themselves breached the Contract before any repudiation by GLP.

A. Repudiation

¶17    The district court granted summary judgment to the Smargons, concluding that GLP had breached the Contract by repudiation. GLP argues that in granting summary judgment, the district court inappropriately resolved a factual issue as a matter of law: whether GLP provided adequate assurances to the Smargons that it would perform as required under the amended Contract to mitigate the noise in the Unit caused by the equipment in the mechanical room.

¶18    Repudiation of a contract "'gives rise to a claim for . . . total breach.'" *Bitzes v. Sunset Oaks, Inc.*, 649 P.2d 66, 70 (Utah 1982) (quoting Restatement (Second) of Contracts § 253(1) (1979)). If a party to a contract has "reasonable grounds . . . to believe that the [other party] will commit a breach by non-performance that would of itself give [rise to] . . . a claim for . . . total breach," he or she "may demand adequate assurance of due performance." Restatement (Second) of Contracts § 251(1). Under such circumstances, the demanding party "may treat as a repudiation the [other party']s failure to provide within a reasonable time such assurance of due performance as is adequate in the circumstances of [a] particular case." *Id.* § 251(2); *see also Bitzes*, 649 P.2d at 70. "Whether an assurance of due performance is 'adequate' depends on what . . . is reasonable to require in a particular case taking account of the circumstances of that

case." Restatement (Second) of Contracts § 251 cmt. e; *see also id.* (explaining that "relevant factors" to be considered in assessing the adequacy of assurances include "[t]he relationship between the parties, any prior dealings that they have had, the reputation of the party whose performance has been called into question, the nature of the grounds for insecurity, and the time within which the assurance must be furnished").[2]

¶19 The issue presented for review under the repudiation analysis is a narrow one. GLP concedes that the March 9, 2005 letter modified the Contract; therefore, GLP was required by the Contract to "make every effort to mitigate the noise [coming from the equipment in the mechanical room] . . . to [e]nsure that the noise [in the Unit] is reduced to an acceptable level." Further, the noise and vibration in the Unit caused by the equipment in the mechanical room was not at "an acceptable level" on the day before the scheduled closing, and GLP does not dispute that the Smargons had reasonable grounds to doubt whether GLP would perform as required under the Contract. Thus, the pertinent question is whether GLP provided the Smargons with adequate assurances of its performance.[3] Specifically, the Smargons were entitled to treat GLP's

---

2. Section 251 of the Restatement (Second) of Contracts is modeled after section 2-609 of the Uniform Commercial Code (the UCC). Both rules rest on similar principles, but the relevant portion of the UCC only "applies to contracts for the sale of goods" while the rule as stated in the Restatement "is a generalization, applicable without regard to the subject matter of the contract." Restatement (Second) of Contracts § 251 cmt. a (1979). Despite the Restatement being modeled after the UCC, the two differ in some ways: for example, under the Restatement, "[w]hether an assurance of due performance is 'adequate' depends on what . . . is reasonable to require in a particular case taking account of the circumstances of that case," *id.* § 251(2) & cmt. e; whereas the UCC provides that assurances must be "adequate under the circumstances of the particular case" but specifies that "the adequacy of any assurance offered shall be determined according to commercial standards," U.C.C. § 2-609(4), (2) (1999). Despite this variation, cases decided under the UCC are helpful to our analysis due to the substantive similarities of the rules.

3. Under the repudiation analysis, GLP argues on appeal that the Smargons failed to demand assurances and that a valid demand must be in writing. GLP asserts that the

(continued...)

failure to mitigate the noise and vibration in the Unit as a repudiation of the Contract if GLP "fail[ed] to provide [adequate] assurances of such performance, within a reasonable time under the circumstances." *See* Restatement (Second) of Contracts § 251(2). In granting summary judgment, the district court concluded that GLP's assurances to the Smargons were inadequate as a matter of law.

¶20 "[N]ormally . . . the adequacy of any assurance offered [is a] factual question[, but] . . . to preclude summary judgment on this issue, the evidence relied upon . . . would have to be such that a rational trier of fact might conclude that . . . [a party] gave adequate assurance." *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 568 (10th Cir. 1989) (citation omitted). If "[a] rational trier of fact could not make such a conclusion," then summary judgment is appropriate. *Id.*; *see also Brisbin v. Superior Valve Co.*, 398 F.3d 279, 285 (3d. Cir. 2005) (explaining that the adequacy of assurances is "generally [a] question[] of fact, but may sometimes be decided as a matter of law"); *Spring Creek Holding Co. v. Shinnihon U.S.A. Co.*, 943 A.2d 881, 894-95 (N.J. 2008) (explaining that whether assurances are adequate is "ordinarily [a] question[] of fact for the jury" but "occasions do arise where the undisputed facts establish that" assurances are inadequate "as a matter of law," thus summary judgment may be appropriate if "no

---

3. (...continued)

district court "was apparently unaware of the requirement that the Smargons must make a demand for adequate assurances." However, the court's failure to take up the question seems to have resulted from GLP's failure to bring the issue to the court's attention. As a result, the issue is not preserved and we do not address it further. *See generally 438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801 ("[I]n order to preserve an issue for appeal[,] the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue" by "put[ting] the trial judge on notice of the asserted error and allow[ing] for correction at that time in the course of the proceeding. For a trial court to be afforded an opportunity to correct the error (1) the issue must be raised in a timely fashion[,] (2) the issue must be specifically raised[,] and (3) the challenging party must introduce supporting evidence or relevant legal authority." (alterations in original) (citation and internal quotation marks omitted)).

rational trier of fact could conclude that . . . adequate assurance" was given).[4] GLP argues that because the adequacy of assurances is a fact-intensive inquiry, the district court inappropriately decided that issue on summary judgment. According to GLP, there are genuine issues of material fact as to whether the assurances provided were adequate, and those factual issues should have been resolved by a jury. In response, the Smargons assert that summary judgment was appropriate because, based on the undisputed facts, no reasonable trier of fact could conclude that GLP had given them adequate assurances.

¶21   In addressing the adequacy of the assurances, GLP and the Smargons rely upon the letters. Because these writings are the only evidence GLP and the Smargons rely upon, our analysis is similarly limited. There is no dispute that GLP sent the letters in response to the Smargons' concerns about noise and vibration in the Unit, and their content is likewise undisputed. The parties' contentions focus, rather, on the legal import of the letters, that is, whether as a matter of law the letters communicate assurances of GLP's performance that were adequate under the circumstances. Based on the content of the letters, we conclude that a rational trier of fact could not conclude that GLP adequately assured the Smargons that it would resolve the noise and vibration problem; summary judgment was, therefore, appropriate.

¶22   In the August 20 letter, GLP listed some specific actions that it "might do to further reduce the noise levels," such as putting "spring isolators and dampers under the chiller," "a sound blanket on the chiller," and "isolators at pipe wall penetrations."

---

4. While Utah courts have not addressed the propriety of determining on summary judgment the adequacy of assurances in a repudiation context, the underlying principle is nevertheless established under our own case law. *See Oman v. Davis Sch. Dist.*, 2008 UT 70, ¶¶ 48-49, 194 P.3d 956 ("Summary judgment is appropriate only when reasonable minds could not differ" in resolving a fact-intensive issue. If "no reasonable person could conclude" that the facts support a particular position, then summary judgment is appropriate.); *Sanderson v. First Sec. Leasing Co.*, 844 P.2d 303, 306 (Utah 1992) (explaining that although factual questions are better decided by a jury than on summary judgment, "the court retains the power to decide whether, as a matter of law, a reasonable jury could" reach a legal conclusion based on the facts, and "[i]f a reasonable jury cannot" reach the required legal conclusion based on the facts, then "summary judgment is appropriate").

GLP also assured the Smargons that these actions "should greatly reduce the noise." But GLP also wrote,

> [W]e feel we have an enforceable contract. I am sorry about how you felt about the condition of your condominium but even with the . . . things needing punchlist attention, the unit was as the contract specified. . . . All the issues you raised would be taken care of in a usual punchlist process . . . . As to the noise, there were some unusual circumstances present when you were here but the sound levels are, under normal conditions, much lower than you heard.

GLP then stated that it would "consent to refund [the] deposit" as well as the amount the Smargons had paid for upgrades to the Unit.

¶23 A little over a week later, in the August 29 letter, GLP wrote,

> [GLP] feels that we are on firm ground and that you are now technically in default. Some aspects of the noise you heard when here have been mitigated and further steps are being taken. With this being said, GLP is willing to release you from your contract and refund both your deposit and the monies you have spent to modify your unit.

GLP then gave the Smargons two options:

> First is to close on the property . . . . [S]econd . . . we will agree to let you out of the contract with full refund of your deposit and [the monies spent to modify the unit]. This offer . . . is open until close of business . . . on the 7th of September, 2007. After that date, if you have not either elected to be released from your contract or closed on the condominium, we will consider you in default with all the consequences that such condition warrants.

GLP rejected the Smargons' request to be compensated for the appreciation in value of the Unit. GLP apologized for the letter's "litigious tone" but explained that it had "spoken to our attorney and he feels we are on extremely firm ground in our position" and "feels that we do not need to make our generous offer of releasing you from your obligations and returning your money." GLP also pointed out that, under the Contract, "the loser in any litigation will pay for the legal cost of the prevailing party so we feel totally confident in what we have proposed."

¶24    The final letter, dated September 6, was written by GLP's attorney. In it, GLP asserted that "[t]he Smargons failed to close on the purchase of the unit [on August 10] pursuant to the terms of the purchase contract and have thereby defaulted on their obligations under that contract," but GLP had "performed its obligations under that contract." GLP wrote that

> [r]ather than closing on the unit as required by the contract[, the Smargons had] attempted to impose upon [GLP] other demands and requirements not provided for in the contract, such as returning [the] option money, paying interest and paying additional sums . . . , all based on [their] apparent dislike of the unit because of sound that originates in a nearby mechanical room, which [they] believe[d] will be bothersome.

GLP asserted that any such concerns "would not have been grounds to refuse to close or delay closing" and "such concerns would have been addressed through the punch list procedure provided for in the contract." According to GLP, it was "confident that [it] delivered a unit that meets or exceeds any applicable industry standards" and that it had "taken additional measures to reduce any possible sound from the mechanical room" and had "made significant efforts to resolve the Smargon[s'] concerns." GLP then restated its previous offer that, "notwithstanding the fact that the Smargon[s] have defaulted on their obligations under the purchase contract," GLP would either "allow the Smargons to close on the purchase of the unit under the terms of the contract" or "return the option money paid by the Smargons to them together with the amounts previously paid by the Smargons [to modify the Unit] and allow the Smargons to be released from their obligations under the contract." GLP required, however, that "[t]he acceptance of either of the above offers must also be accompanied by a signed full

release of any potential claims by the Smargons." GLP then restated the "deadine of tomorrow, September 7, 2007, 5:00 p.m. . . . to accept either of these offers or the offers will automatically lapse." If neither offer were accepted, GLP would "consider the contract terminated, with no further obligations to the Smargons," and it would

> retain all money paid by the Smargons pursuant to the terms of the contract and . . . remarket and resell the unit. If the Smargons choose to pursue this matter, [GLP] will seek reimbursement of all enforcement, litigation or other similar costs incurred in response to the Smargons' actions, as provided for in the contract.

GLP's attorney then stated,

> I do not believe that [GLP] has the legal obligation to do any of these things for the Smargons. I believe that the Smargons have defaulted by not closing and that [GLP] has the right, as one of their various remedies under the contract, to unilaterally terminate the contract, keep all option money or other money paid by the Smargons and resell the unit with no further obligation to the Smargons. [GLP] has been very generous and accommodating in trying to amicably resolve the Smargons' concerns, especially in light of the fact that the Smargons have defaulted on their contractual obligations.

The Smargons accepted neither offer.[5]

---

5. As previously mentioned, *see supra* ¶ 10, it appears that the main reason that the Smargons did not simply accept GLP's offer to be released from the Contract was due to a dispute over the amount of damages to which the Smargons were entitled. The Smargons requested that GLP pay them the appreciation in value of the Unit between the time of contracting and the time scheduled for closing. GLP refused to do so, and the Smargons consequently declined GLP's offer for reimbursement. In addition, the Smargons assert that in offering to reimburse them the monies already paid for the Unit, GLP offered less than they would be entitled to under the Contract. Specifically,

(continued...)

¶25    In arguing that the district court inappropriately concluded as a matter of law that it failed to provide the Smargons with adequate assurances, GLP relies on portions of the August 20 email and August 29 letter, which GLP asserts contain assurances that a trier of fact could reasonably conclude were adequate under the circumstances. GLP relies primarily on the August 20 email where it listed some specific actions it might undertake to address the noise in the Unit caused by the equipment in the mechanical room that "should greatly reduce the noise." Similarly, GLP also relies on the August 29 letter, where it stated that "[s]ome aspects of the noise . . . have been mitigated and further steps are being taken." However, the adequacy of the assurances given must be determined by the August 20, August 29, and September 6 letters as a whole. *See Spring Creek Holding Co. v. Shinnihon U.S.A. Co.*, 943 A.2d 881, 896 (N.J. 2008) (explaining that the adequacy of assurances must be assessed in the context of which they were given); *see also Brisbin v. Superior Valve Co.*, 398 F.3d 279, 289 (3d. Cir. 2005) (explaining that the "analysis must be based on the facts and circumstances known at the time," so "[i]f a party had no knowledge of certain facts, it follows that" the party's conduct "was not based on those facts"). When all three of the letters are considered together, we agree with the district court that the assurances GLP gave the Smargons are inadequate as a matter of law.

¶26    The assurances that GLP provided in the August 20 and August 29 writings were accompanied by attempts to minimize the extent of the noise problem. In the August 20 email, GLP attributed the noise to "some unusual circumstances" that were present at the time of the walk-through inspection and explained that "the sound levels are, under normal conditions, much lower"--though GLP did not describe those unusual circumstances or provide any information from which the likelihood of their recurrence could be assessed. In the same letter, GLP also asserted that "the unit was as the contract specified" and "the issues . . . raised would be taken care of in a usual punchlist

---

5. (...continued)

under the Contract, the Smargons would be entitled to be reimbursed the option money and the earnest money deposit, as well as applicable interest. However, in these letters it is arguable that GLP only offered to reimburse the option money or the earnest money deposit but not both. Indeed, the Smargons have asserted this as an alternative basis for their argument that GLP repudiated the Contract, but because we conclude that GLP repudiated the Contract by failing to provide adequate assurances of its performance with respect to the noise problem, we do not reach that issue.

process." A little over a week later, in the August 29 letter, GLP stated that "[s]ome aspects of the noise . . . have been mitigated and further steps are being taken," though it did not explain the nature or extent of the mitigation in any way or describe the "further steps" and their potential impact. In the broader context of the August 20 email and the August 29 letter, GLP's more tangible assurances seem equivocal and noncommittal, thereby significantly undermining their adequacy. *See, e.g., Spring Creek Holding Co.*, 943 A.2d at 897-98 (reasoning that assurances were inadequate where they only "constituted predictions of success in [pending] litigation or straight denials of any problem" without "provid[ing] other tangible assurance").

¶27 The adequacy of the assurances is further undermined by GLP's accompanying assertions that the Smargons themselves had breached the Contract and its concomitant demand that the Smargons close on the Contract. GLP first offered in the August 20 email to refund the Smargons' monies already paid for the Unit or proceed to closing, also stating that it "fe[lt it] had an enforceable contract." But the August 29 letter had what GLP itself described as a more "litigious tone." In that letter, GLP offered that the Smargons could either close on the Contract or be reimbursed monies already paid for the Unit, but GLP also asserted that the Smargons were "technically in default" and demanded that the Smargons accept one of its offers by September 7 or be "in default with all the consequences that such condition warrants." In that letter, GLP further stated that it was on "extremely firm ground" and explained that it was not obligated to return any of the Smargons' money. GLP also pointed out that, under the Contract, "the loser in any litigation will pay for the legal cost of the prevailing party."

¶28 To the extent the first two letters gave any assurances at all, the September 6 letter effectively abandoned them. Drafted by GLP's attorney, that letter was clearly prepared in anticipation of litigation. GLP repeated its general representation that it had "taken additional measures to reduce any possible sound from the mechanical room" and had "made significant efforts to resolve the Smargon[s'] concerns," but GLP again failed to give any further reassuring details about its efforts. Rather, GLP simply asserted that it had "performed its obligations under th[e] [C]ontract" and demanded that the Smargons either close on the Contract the next day, with the Unit remaining essentially "as is" with regard to the mechanical room problem, or accept a reimbursement of monies paid for the Unit. GLP gave the Smargons only one day to choose between the two options or be considered in default of the Contract and lose all monies already paid, nearly $400,000. In addition, GLP demanded that the Smargons'

20110059-CA                                    15

acceptance of either offer "must be accompanied by a signed full release of any potential claims by the Smargons." Finally, GLP threatened that if the Smargons themselves pursued the matter, GLP would "seek reimbursement of all enforcement, litigation or other similar costs incurred in response to the Smargon[s'] actions."

¶29 Thus, in the course of only two weeks, GLP's letters to the Smargons progressed from vague yet conciliatory descriptions of some specific steps it might take in order to remedy a serious problem to assertions that the Smargons themselves were in default while GLP had fully performed, without presenting any information on the nature of that performance or its effects, much less details that could provide tangible reassurance about its efficaciousness. These assertions were further accompanied by demands that the Smargons immediately close on the Contract to avoid losing everything they had already paid toward the Unit. Indeed, in making these demands, GLP required the Smargons to close before it demonstrated that it had "mitigate[d] the noise . . . to an acceptable level," as required under the modification to the Contract. In addition, GLP demanded that, in accepting either offer, the Smargons release any potential claims against GLP. This would essentially deprive the Smargons of their ability to address (1) whether GLP had performed as required under the Contract by reducing the noise in the Unit to "an acceptable level" or (2) whether the monetary damages GLP offered to the Smargons were consistent with those provided by the Contract, regardless of whether GLP or the Smargons had breached the Contract, *see supra* ¶ 24, n.5. *See, e.g.,* *Bitzes v. Sunset Oaks, Inc.*, 649 P.2d 66, 70 (Utah 1982) ("The respondent's answer through its attorney inviting a lawsuit is certainly a failure to provide any assurance of due performance."); *see also Spring Creek Holding Co., Inc.*, 943 A.2d at 897-98 (reasoning that one party's characterization of the other party's "expression of insecurity [of performance] as an anticipatory breach" and threatening litigation were not "adequate assurance of performance"); *Brisbin*, 398 F.3d at 288 (reasoning that assurances were inadequate where one party's correspondence indicates a "willingness to entertain alternative forms of assurances in lieu of immediate payment" and "demonstrate[d] a continued interest in reaching an amicable solution," but the other party "neither presented a single counterproposal nor gave any indication that it was willing and able to perform its obligations under the contract" and instead "decided to cease all communications and referred the matter to its legal department").

¶30 Accordingly, we conclude that the district court appropriately granted summary judgment because, based on the undisputed facts, GLP failed to provide adequate

assurances to the Smargons as a matter of law. *See Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 568 (10th Cir. 1989) ("[N]ormally [under a repudiation analysis] . . . the adequacy of any assurance offered [is a] factual question[, but] . . . to preclude summary judgment on this issue, the evidence relied upon . . . would have to be such that a rational trier of fact might conclude that . . . [a party] gave adequate assurance." If "[a] rational trier of fact could not make such a conclusion," then summary judgment is appropriate. (citation omitted)).

B. Breach of Contract

¶31     GLP contends that regardless of whether it breached the Contract by repudiation, the Smargons breached the Contract first, thereby relieving GLP of any further obligation. Specifically, GLP argues that under the Contract, the Smargons were required to close on the purchase despite any repair work needed to complete the Unit, including any repair work required to mitigate the noise and vibration in the Unit caused by the mechanical room equipment.

¶32     In support of its argument, GLP relies on a plain language interpretation of the Contract. "The goal of contract interpretation is to give effect to the contracting parties' intentions at the time the contract was made." *Merrick Young Inc. v. Wal-Mart Real Estate Bus. Trust*, 2011 UT App 164, ¶ 17, 257 P.3d 1031. "[U]nder well-accepted rules of contract interpretation, we [begin our analysis by] look[ing] to the language of the contract to determine its meaning and the intent of the contracting parties. We also consider each contract provision . . . in relation to all of the others, with a view toward giving effect to all and ignoring none." *Id.* (second and third alterations and omission in original) (internal quotation marks omitted). "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Id.* (internal quotation marks omitted).

¶33     In support of this position, GLP relies on section 3.1 of the Contract, which provides the Smargons with a procedure to identify repair work needed to complete construction of the Unit by conducting a walk-through inspection and creating a "punch list" of the needed repair work. Specifically, section 3.1 of the Contract provides,

Buyer may conduct a "walk-through" inspection of the Condominium Unit . . . [, which] shall be for the purpose of identifying any corrective or repair work . . . that needs to be completed to achieve substantial completion of the Condominium Unit pursuant to the Plans and Specifications . . . . If . . . Repair Work remains to be completed, this shall not alter Buyer's obligation to close . . . . Buyer may, pending completion of such Repair Work withhold in escrow . . . , a reasonable amount set by Seller in the exercise of the good faith reasonable judgment of the Seller, sufficient to pay for completion of such Repair Work. If such Repair Work is not completed within thirty (30) days after Settlement, the amount so escrowed may, at Buyer's option, be released to Buyer as liquidated and agreed damages for failure to complete the Repair Work. The exercise by the Buyer of the option to take the escrowed funds shall be deemed to be full and final settlement of any damages to the Buyer by reason of the failure to timely complete and no other or further claim may be made by Buyer in connection therewith. As portions of the Repair Work are completed, the Buyer shall authorize interim releases to the Seller of some of the escrowed funds so long as the remaining funds remain sufficient to reasonably cover the remaining incomplete Repair Work.

¶34    According to GLP, the Contract "contemplates that the Unit may still be imperfect at the time scheduled for closing, and the Contract [thus] specifies an exclusive procedure for addressing and correcting any imperfections." Specifically, GLP looks to the portion of section 3.1 of the Contract, which states that "[t]he 'walk-through' inspection shall be for the purpose of identifying any corrective or repair work . . . that needs to be completed to achieve substantial completion of the Condominium Unit pursuant to the Plans and Specifications." GLP further relies on section 1.2, which provides that the "Unit and related improvements shall be constructed in accordance with the architectural and engineering renderings, plans and specifications." GLP explains that under section 1.2, "the subject matter of the 'Plans and Specifications' is . . . the 'Unit and related improvements.'" Reading these sections together, GLP asserts

that because section 3.1 provides that the Unit must be completed pursuant to the plans and specification, the walk-through inspection established in section 3.1 applies to the entire subject matter of the plans and specifications as provided in section 1.2--that is, not just the Unit itself but related improvements as well. In other words, according to GLP, section 3.1 should be interpreted as providing that the walk-through inspection is for the purpose of identifying any repair work "that needs to be completed to achieve substantial completion of the Condominium Unit [*and related improvements*] pursuant to the Plans and Specifications."

¶35    Based on this conflation of sections 3.1 and 1.2, GLP asserts that the noise and vibration in the Unit caused by the equipment in the mechanical room is a "related improvement[]" and is, therefore, the sort of repair work that must be addressed through the punch list process as provided in section 3.1 to achieve substantial completion of the Unit. GLP further asserts that since the noise and vibration process should have been addressed under section 3.1, the Smargons were required to close on the Contract while the necessary repair work was still in process because section 3.1 further provides that if "Repair Work remains to be completed, this shall not alter the Buyer's obligation to close the purchase transaction." GLP thus contends that by failing to close, the Smargons breached the Contract.

¶36    The Smargons counter that the Contract cannot reasonably be read this way, and we agree. Section 1.2 provides generally that the Unit and related improvements will be constructed according to the plans and specifications. By its own terms, the procedure set forth in section 3.1 specifically contemplates identification of "any corrective or repair work" that must be "completed to achieve substantial completion of the Condominium Unit." Simply because the plans and specifications, as a general matter, encompass the entire condominium project, including the Unit, does not ipso facto mean that the entire development is subject to the punch list procedure in section 3.1. Such an interpretation of the Contract would require the Smargons--and every other purchaser--to inspect common areas, such as equipment in mechanical rooms, in order to identify a possibly vast array of problems that might have some impact on the individual unit subject to the particular purchase contract. Thus, a simple walk-through inspection to identify obvious repair work required to complete work on an individual unit--such as cracked tile, problems with paint and drywall, poorly-laid carpets, non-functioning electrical outlets, and other issues that a typical buyer would detect--could become a matter requiring significant investment of time by the buyer and expertise

beyond that expected of the great majority of residential purchasers. This is substantially more than can be reasonably read into the concept of a "'walk-through' inspection" by the buyer of a condominium unit. *See generally McNeil Eng'g & Land Surveying, LLC v. Bennett*, 2011 UT App 423, ¶ 17, 268 P.3d 854 ("'[A]n interpretation which gives a reasonable . . . meaning to all the terms [in a contract] is preferred to an interpretation which leaves a part unreasonable . . . .'" (quoting Restatement (Second) of Contracts § 203(a) (1979))).

¶37    Further, the procedure set forth in section 3.1 for resolving repair work identified during a walk-through inspection is simply not designed to address the kind of problem posed by the vibration and noise in the Unit emanating from the mechanical room. Under section 3.1, when the need for repair work is identified, the buyer may "withhold [from the purchase price] in escrow . . . a reasonable amount set by Seller . . . sufficient to pay for completion of" the repair work. If the seller fails to complete that repair work within thirty days of closing, the escrowed funds may be released to the buyer, at the buyer's option, "as liquidated and agreed damages for failure to complete" the repair work, presumably so that the buyer can then complete the repair work herself. Such a process is readily applicable to a defect that occurs within an individual unit. For example, during the aborted walk-through inspection, the Smargons identified a problem with the custom flooring in the Unit. Hypothetically, had the Smargons closed on the Contract and GLP had not completed that repair work before closing, the Smargons could have opted to escrow enough money to cover the repair and could later complete the work themselves if GLP did not do so within the prescribed thirty days. In contrast, section 3.1 is ill-adapted to the noise and vibration problem that confronted the Smargons. By the time scheduled for closing, and even as of late 2007, GLP apparently had been unable to fully remedy the mechanical room problem, despite having consulted with its architects and engineers. It is unreasonable to expect that the Smargons, no matter how sophisticated they might otherwise be, would be independently capable of managing the correction of a problem of that nature and scope. In addition, it is not reasonable to assume that GLP would even permit the Smargons to independently undertake modifications and repairs to such mechanical issues. Thus, the noise and vibration in the Unit caused by the equipment in the mechanical room is not reasonably redressable through the punch list process as provided in section 3.1 of the Contract.

¶38    Accordingly, we conclude that the noise and vibration in the Unit caused by the equipment in the mechanical room does not fall within the scope of the punch list process provided for in section 3.1 of the Contract.  Therefore, the district court did not err when it concluded that the Smargons' refusal to close on the purchase of the Unit while GLP attempted to remedy the problem did not breach the Contract.

## II.  Damages

¶39    GLP also challenges the district court's award of damages to the Smargons.  The Contract contains a liquidated damages provision, which provides that if GLP defaults, the Smargons' "sole and exclusive remedy shall be to receive . . . a refund of the Earnest Money Deposit plus interest thereon at an annual rate of seven percent (7%) from the date of receipt of the Earnest Money Deposit in escrow until the date of [GLP]'s default and . . . an amount equal to the amount of the Option Payment."  After a bench trial, the court awarded these liquidated damages to the Smargons, reimbursing them for their option payment and earnest money deposits, with interest as provided by the Contract.  The Smargons also sought expectancy damages in the amount the Unit had appreciated in value from the date of the Contract.  The court concluded, however, that such an award was barred by the liquidated damages provision because the amount was "incapable or very difficult of accurate estimation at the time of execution of the contract."  Nevertheless, the court awarded the Smargons reliance damages in the amount they had paid for custom modifications and upgrades to the Unit.  The court reasoned that "at the time of contract formation" GLP knew "that it would allow buyers of condominium units to make change order upgrades, opening the door for buyers to spend substantial amounts of money on those upgrades," yet the liquidated damages provision did "not reasonably forecast just compensation" for those amounts in the case of breach.  The court further reasoned that the amount the Smargons had paid to modify the unit was "capable of accurate estimation."  In fact, the Smargons and GLP stipulated to the amount the Smargons had spent to modify the Unit.

¶40    On appeal, GLP argues that the district court erred in awarding reliance damages because "the parties agreed that in the event of a breach by either party, the sole and exclusive remedy for the non-breaching party would be liquidated damages in the amount of the Earnest Money Deposit, Option Payment, and applicable interest."  There are various legal standards that can be applied to determine the enforceability of a liquidated damages provision.  *See generally Commercial Real Estate Inv., LC v. Comcast of*

*Utah II, Inc.*, 2012 UT 49, ¶¶ 21-32 (explaining multiple analytical approaches to determining the enforceability of a liquidated damages provision). In challenging the court's decision, GLP's argument focuses on a particular analytical approach where the enforceability of a liquidated damages provision is determined based on whether it amounts to a penalty. (Citing *Mahoney v. Tingley*, 529 P.2d 1068, 1070 (Wash. 1975); *Margaret H. Wayne Trust v. Lipsky*, 846 P.2d 904, 910 (Idaho 1993).) However, in reaching its decision, the district court did not conduct a penalty analysis but instead examined the enforceability of the liquidated damages provision under section 339 of the Restatement (First) of Contracts, which provides that an "agreement, made in advance of breach fixing the damages therefor, is not enforceable as a contract and does not affect the damages recoverable for the breach, unless . . . the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and . . . the harm that is caused by the breach is one that is incapable or very difficult of accurate estimation." *Reliance Ins. Co. v. Utah Dep't of Transp.*, 858 P.2d 1363, 1367 (Utah 1993) (internal quotation marks omitted), *abrogated by Commercial Real Estate Inv.*, 2012 UT 49. Because GLP does not challenge the actual basis for the district court's decision and failed to analyze the issue under the applicable legal standard, we decline to address this issue further.[6] *See generally Allen v. Friel*, 2008 UT 56, ¶ 7, 194 P.3d 903 ("If

---

6. At the time of the district court's decision, it appeared that Utah followed section 339 of the Restatement (First) of Contracts in analyzing the validity of contractual liquidated damages provisions. *See Reliance Ins. Co. v. Utah Dep't of Transp.*, 858 P.2d 1363, 1366 (Utah 1993) ("In determining the validity of a liquidated damages provision, this court has adopted section 399 of the Restatement of Contracts."), *abrogated by Commercial Real Estate Inv., LC v. Comcast of Utah II, Inc.*, 2012 UT 49, ¶ 27 (explaining that "[t]he three most recent Utah Supreme Court cases to consider liquidated damages have all done so pursuant to section 339 of the first Restatement of Contracts" but stating that prior case law never "officially *adopted* the Restatement's test"). Very recently, in *Commercial Real Estate Investment, LC v. Comcast of Utah II, Inc.*, 2012 UT 49, the Utah Supreme Court abandoned the Restatement approach in favor of reviewing "liquidated damages clauses . . . in the same manner as other contractual provisions," which are only to be invalidated if "enforcement of a liquidated damages clause would be unconscionable." *Id.* ¶ 38; *see also id.* ¶¶ 33-40 (setting forth the new approach to reviewing the enforceability of liquidated damages provisions). Notably, on appeal GLP does not advocate for application of the approach ultimately adopted by the supreme court in

(continued...)

an appellant fails to allege specific errors of the lower court, the appellate court will not seek out errors in the lower court's decision.").

¶41 GLP also argues that the Smargons were precluded from seeking both expectancy damages and reliance damages. The authority GLP relies on, however, stands for the proposition that a party cannot *recover* both expectancy and reliance damages; it does not provide that a party may not *request* both expectancy and reliance damages. *See White v. Nemastil*, 503 N.E.2d 189, 195 (Ohio Ct. App. 1985) (explaining that the buyers "were entitled to *recover* the highest of one of three possible measures of damages: (a) their expectancy damages, (b) their reliance damages, or (c) their restitution damages. They were not entitled to *recover* under more than one of these three legal theories." (emphasis added) (citation omitted)). Though the Smargons may have requested both expectancy and reliance damages, the district court awarded only reliance damages. Thus, the authority GLP relies upon is inapplicable to the court's decision to award the Smargons only reliance damages rather than expectancy damages.


CONCLUSION

¶42 We conclude that the district court appropriately granted summary judgment to the Smargons, having determined that GLP breached the Contract by repudiation when it failed to provide adequate assurances to the Smargons that it would perform as required under the Contract. In addition, the Smargons did not breach before GLP's repudiation when they refused to close as provided under section 3.1 of the Contract. We further decline to find error with the district court's award of damages where GLP has failed to challenge the basis for the court's decision.

---

6. (...continued)
*Commercial Real Estate Investment*. *See generally id.* ¶¶ 22-23, 34 (describing the penalty approach to assess the enforceability of liquidated damages, but declining to adopt it because the purpose of "the penalty inquiry . . . can be adequately protected through general contractual remedies"). We decline to consider or apply this recent change in our case law here because GLP has failed to appropriately challenge the basis for the district court's decision in the first instance.

¶43    Accordingly, we affirm.

_____

Stephen L. Roth, Judge

                                                      -----

¶44    WE CONCUR:

_____

James Z. Davis, Judge

_____

William A. Thorne Jr., Judge