**2022 UT App 86**

# THE UTAH COURT OF APPEALS

HOLDEN JESSUP AND MICHAEL KRISTY,
Appellants,
*v.*
FIVE STAR FRANCHISING LLC, CHAD JONES, AND D. SCOTT ABBOTT,
Appellees.

Opinion
No. 20210220-CA
Filed July 8, 2022

Fourth District Court, Provo Department
The Honorable Thomas Low
No. 200400748

Jonathan L. Jaussi and Stephen W. Whiting,
Attorneys for Appellants

D. Scott Crook and Matthew J. Morrison,
Attorneys for Appellees

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGES
DAVID N. MORTENSEN and RYAN D. TENNEY concurred.

HARRIS, Judge:

¶1     Five Star Franchising LLC (Five Star) leased commercial property from Holden Jessup and Michael Kristy. Several years into the lease term, after interpreting email communication from Jessup and Kristy as an anticipatory repudiation of the lease, Five Star rescinded the lease and later vacated the premises. Jessup and Kristy sued Five Star for breach of the lease, but the district court determined, on summary judgment, that they had repudiated the lease, and on that basis dismissed their lawsuit. Jessup and Kristy now challenge that determination, and we find that challenge to be, at least in one respect, meritorious. Five Star asks us to affirm

on an alternative ground, but we are unable to do so on the record before us. Accordingly, we reverse and remand.

BACKGROUND

¶2    Chad Jones and D. Scott Abbott owned two businesses together—Five Star and Canuck Ventures LLC (Canuck). Canuck owned a piece of commercial property (the Property) located in Spanish Fork, Utah and had leased the Property to Five Star for a number of years. In 2015, however, Canuck decided to put the Property up for sale. As part of the listing summary, Canuck indicated that it anticipated that Five Star would sign a new ten-year lease and remain a tenant of the Property.

¶3    In August 2015, Jessup and Kristy, in their individual capacities, made an offer to purchase the Property. That same month, Canuck (as seller) and Jessup and Kristy (as buyers) entered into a Real Estate Purchase Contract (the REPC), which was made contingent on the execution of a "new lease" between Jessup and Kristy, on the one hand, and Five Star, on the other. Per the REPC, it was anticipated that due diligence would be completed by the end of September, with a closing to occur by the end of November.

¶4    During the due diligence period, Five Star (as the prospective tenant) negotiated the terms of a lease with Jessup and Kristy (as prospective landlords). Parts of the lease were finalized and executed in September 2015, with the final addendum signed no later than October 12, 2015. Jessup and Kristy are described in the lease as "landlord[s]" in their individual capacities ("Holden Jessup and Michael Kristy as Tenants in Common"). But because Jessup and Kristy had not yet finalized the purchase of the Property at the time the lease was signed, the lease was expressly contingent on the anticipated real estate transaction being finalized, stating that "this lease is only

valid if Holden Jessup and Mike Kristy (or their assigns) purchase[] the [Property] before January 1, 2016."

¶5      By its terms, the new lease was to commence on December 1, 2015, the day after the purchase of the Property was to close. The term of the lease was to be ten years, with Five Star obligated to occupy the Property through November 2025. The lease specified the rent amount that Five Star would be obligated to pay each month, an amount that gradually increased each year. Jones and Abbott each agreed to personally guarantee Five Star's obligations under the new lease.

¶6      Most of the terms of the lease were contained in a twenty-five-page single-spaced document (the Base Lease), but some terms were reflected in two short addenda (Addendum 1 and Addendum 2) to the Base Lease. Addendum 1 contained one enumerated modification to the Base Lease, and Addendum 2 contained fourteen more; both addenda stated that their terms were to be considered part of the lease agreement between the parties and that those terms "shall supersede" or "shall control" over the terms of the Base Lease in the event of any conflict. Addendum 2, in particular, stated that "[a]ll other terms of the [Base] Lease not modified" in the addendum "shall remain the same." Only Five Star—and not Jessup or Kristy—signed the Base Lease and Addendum 1, but all parties executed Addendum 2.

¶7      In late November 2015, as anticipated, the real estate transaction closed, and Canuck conveyed the Property out of its possession. As already noted, the "Buyer[s]" listed on the face of the REPC were Jessup and Kristy, in their personal capacities. But not all of the closing documents are contained in the record submitted to us on appeal; indeed, as far as we are aware, the only such document included in our record is a warranty deed, dated November 25, 2015, by which Canuck conveyed the Property not to Jessup and Kristy in their individual capacities but, instead, to Jessup and Kristy in their capacities as trustees of two family

trusts (the Trusts). Under the terms of the deed, Canuck conveyed the Property to "Holden D. Jessup and Adele K. Jessup, Trustees of the Holden D. Jessup and Adele K. Jessup Revocable Living Trust dated October 2, 2000," and to "Michael Kristy and Pamela M. Kristy, Trustees, or their successors in trust, under the Michael Kristy and Pamela M. Kristy Living Trust, dated January 3, 1998."

¶8     In discussing the nature of the November 2015 conveyance, the parties use similar descriptions. In a sworn declaration, Jessup avers that he and Kristy "initially purchased" the Property from Canuck pursuant to the REPC, and then "asked that the [P]roperty be titled in the names of [their] respective trusts." And in its appellate brief, Five Star (apparently quoting Jessup's declaration) states that "Jessup and Kristy purchased the Property and 'asked that the [P]roperty be titled' in" the Trusts.

¶9     After the real estate transaction closed, Five Star occupied the premises, without apparent incident, for some three years, paying rent according to the amounts set forth in the Base Lease. In 2016, the parties agreed to a third addendum to the lease agreement, with Jessup and Kristy executing the addendum in their individual capacities.

¶10    In 2018, Five Star applied for a loan that was to be guaranteed by the federal government's Small Business Administration (the SBA). On May 7, 2018, Jones—on behalf of Five Star—asked Jessup and Kristy, via email, for a copy of the signed Base Lease that Five Star could submit to the SBA as part of its loan application, because "having an original is something SBA will look for." In response, Jessup and Kristy acknowledged that they had never signed the Base Lease and that their decision not to sign it had been intentional, stating specifically as follows:

> In reviewing the [Base Lease] for signature, we remembered why we didn't sign it originally: there are a number of errors and inconsistencies

throughout the document that really need to be corrected before we would feel comfortable signing it.

Jessup and Kristy offered their view that, "[r]ather than spending [time] trying to fix that old document, [they] felt it would be easier" to negotiate a new lease, and they attached their "standard lease agreement," a "30+ page document" they suggested could be used to supplant the Base Lease and its corresponding addenda.

¶11   Five Star was apparently unsure what to make of this response, and just a few minutes later, Jones sought clarification by responding as follows:

It sounded like it might be the case that you never signed the [Base Lease]. If that's the case, as I read your message, it sounded like you are saying you do not agree to that original document and will instead only sign this new version and not execute the earlier version with which you didn't fully agree. Is that correct?

¶12   Over an hour later, at 4:09 p.m. on May 7, Jessup and Kristy responded by stating as follows:

We do not have a fully-signed copy of the 2015 lease agreement. It was never signed by us, and instead, we all created [Addendum 2] to patch over it and its shortcomings. We're really uncomfortable signing the 2015 agreement as-is, for the reasons we've stated. We strongly prefer that we all sign the new lease agreement.

¶13   Later that afternoon, Jones issued this response, which was the final communication in the May 2018 email exchange:

> Thanks for clarifying your position. Based on your confirming the reasons for not signing, we concur that a new agreement is preferable. . . . [W]e are aligned in confirming that [the earlier] lease agreement was never fully agreed to by either side. As such, we hereby revoke our signatures to the earlier draft agreement to match your refraining from signing.
>
> This creates a significant need to execute a new agreement. We will forward your draft to counsel, and anticipate having some redlines which we may need to discuss moving forward. In the interim, if acceptable, we will continue making payments along the previous course of conduct, although noting that these payments are interim payments and will need to be aligned with a full lease agreement, since you did not feel comfortable with the earlier draft language.

The record submitted to the district court on summary judgment contains no indication of any response by Jessup or Kristy to this final email.

¶14 Following Five Star's final email, the parties were never able to agree on the terms of a new lease. Nevertheless, Five Star continued to occupy the premises in accordance with the parties' prior arrangement for nearly another two years, paying rent according to the gradually escalating amounts set forth in the Base Lease. In or about March 2020, however, Five Star vacated the premises and refused to make further payments.

¶15 Shortly thereafter, Jessup and Kristy, in their individual capacities, filed this lawsuit, alleging breach of contract against

Five Star and breach of guaranty against Jones and Abbott.[1] Defendants answered the complaint, denying most of the allegations and asserting several defenses, including that Jessup and Kristy's claims were "barred by the doctrine of anticipatory repudiation and/or rescission" and that the claims were "barred because [Jessup and Kristy] lack standing to assert them and/or they are not the real parties in interest."

¶16   Early in the litigation, before any discovery had occurred, Defendants filed a motion for summary judgment based on these defenses. First, Defendants asserted that Jessup and Kristy "do not own the Property and never owned the Property at the time" the lease agreement was entered into, and argued that, because the Property was ultimately titled in the name of the Trusts, Jessup and Kristy could not have entered "into a valid and enforceable lease." Second, Defendants asserted that, even if the lease were valid, Jessup and Kristy had repudiated it during the 2018 email exchange, that the parties had been operating under a month-to-month arrangement since then, and that Jessup and Kristy therefore had no valid claims in connection with Five Star vacating the premises in 2020.

¶17   In responding to Defendants' motion, Jessup and Kristy disputed Defendants' contention that they had never owned the Property, relying on Jessup's declaration that they had "initially purchased" it before asking that it be titled in the name of the Trusts. They also asserted that they had full authority to act on behalf of the Trusts in any event, and that factual questions precluded summary judgment on this issue.

¶18   But Jessup and Kristy did not make any legal argument in response to Defendants' second theory—that they had repudiated

---

1. Five Star, Jones, and Abbott are herein sometimes referred to collectively as "Defendants."

the lease during the 2018 email exchange.[2] They did attach—as part of a request for the court to defer consideration of Defendants' motion until after discovery could be completed—a brief declaration stating that they wished to undertake discovery regarding, among other things, whether "the lease was . . . validly rescinded." But Jessup and Kristy did not mention the word "repudiate" or "rescind" in the argument section of their opposition memorandum.

¶19 At oral argument on the motion, Defendants' attorney first addressed the trust issue, noting that title to the Property was "never conveyed to these two plaintiffs, they've never owned this real estate and therefore they've never had an ability to convey the bundle of rights in here into the leasehold interest in that real estate to these defendants." Next, Defendants' attorney addressed the issue of repudiation, arguing that the 2018 email exchange "gave [Five Star] a basis upon which [it] could reasonably rely, that there had never arisen a lease agreement and instead, there had, throughout this time, been a tenancy at will."

¶20 When it was his turn to speak, the attorney representing Jessup and Kristy responded to both arguments—this time,

---

2. The only passing allusion Jessup and Kristy made to this issue came in their response to Defendants' statement of undisputed material facts. At various points in their motion, Defendants had quoted from the 2018 email exchange, and Jessup and Kristy responded to some of those asserted facts by stating that "the emails speak for themselves" and by asserting that "Defendants mischaracterize the communications." In particular, they stated that they "believe the lease is valid" and offered their view that the emails showed "that there were flaws in the [Base Lease] that caused [them] to withhold signature until the flaws could be corrected by addendum." In the rest of their memorandum, however, Jessup and Kristy made no effort to develop this thought into any legal argument.

including the repudiation argument. With regard to that issue, counsel admitted that the emails contained in the 2018 exchange were "not the most clear," and acknowledged that, in some ways, the email exchange "does sound . . . like we're saying we don't agree to the lease." But he now offered an alternative interpretation of the exchange: that Jessup and Kristy were indicating they still believed the lease to be valid, and that their signatures on Addendum 2—which they believed patched over any perceived flaws in the Base Lease and incorporated any unaltered terms from the Base Lease—were sufficient to memorialize the arrangement.

¶21 Within that same argument, Jessup and Kristy's attorney also briefly mentioned the existence of a "sub-lease agreement" that he asserted had been signed by the parties in 2018, just days after the May email exchange; counsel asserted that this sublease was indicative of Five Star's understanding that the 2015 lease was still in effect following the email exchange. Though the sublease had been attached to Defendants' motion, this was the first time the court was informed that the sublease might be relevant to the repudiation question.[3]

¶22 After taking the matter under advisement, the district court issued a lengthy written ruling. It was not persuaded by Defendants' arguments regarding the involvement of the Trusts, stating that "little hay can be made over the fact that [Jessup and Kristy] are suing in their individual capacities instead of in the names of" the Trusts because the Trusts were revocable

---

3. The sublease had been mentioned in the factual background section of Defendants' motion for summary judgment and was attached as an exhibit to that motion. But Defendants made no mention of it in the section of their memorandum in which they argued that Jessup and Kristy had repudiated the 2015 lease, and (as noted) Jessup and Kristy made no response to that argument in their opposing memorandum.

and Jessup and Kristy—"as settlors—[were] able, at any time, to withdraw the [P]roperty from the [T]rusts." In addition, and in any event, the court indicated an inclination to grant Jessup and Kristy, pursuant to rule 17(a) of the Utah Rules of Civil Procedure, "a reasonable time to comply with the requirement that the action be prosecuted in the name of the real party in interest."

¶23    But the court was persuaded by Defendants' arguments regarding anticipatory repudiation. It concluded that, as a matter of law and undisputed fact, Jessup and Kristy "expressly, and in writing, repudiated the original lease agreement: they denied ever signing it, indicated that their failure to do so was intentional because they did not like various unstated aspects of the agreement, expressed their belief that they [were] not bound by it, and proposed a new agreement." The court determined that, given the tenor of Jessup and Kristy's 2018 emails, Five Star had validly rescinded the lease, and that Jessup and Kristy had "concurred, by their silence, with [Five Star's] rescission."

¶24    The court also denied the request, made by Jessup and Kristy in connection with their opposition to Defendants' motion, to defer ruling on the motion until further discovery could be had, concluding that Jessup's declaration setting forth the discovery he and Kristy sought to conduct was conclusory, and that Jessup and Kristy "identify no particular evidence they believe to exist, what they must do to obtain it, why the evidence could not yet be obtained, or how the evidence is relevant to Defendants' motion." As a result of its ruling on Defendants' motion, the court dismissed Jessup and Kristy's claims for breach of contract and breach of guaranty, with prejudice and on the merits.

¶25    Jessup and Kristy later filed a motion for relief (the Motion for Relief) from the court's order as it pertained to repudiation.

There, in addition to taking issue with the court's reasoning generally, Jessup and Kristy specifically asked the court to directly address the sublease, which the court had mentioned only in passing in its written ruling. They also alleged, for the first time, that Jessup had attempted to contact Five Star via telephone—after the 2018 email exchange—to "confirm the intention behind this new sublease."[4] And they made other assertions, for the first time, that both parties had continued to perform under the lease, even after the 2018 email exchange. The court denied the Motion for Relief, specifically noting that, during the summary judgment proceedings, Jessup and Kristy had made "no argument or anything close to such an argument" regarding the sublease, and concluding in any event that the presence of the sublease did not change the court's conclusion.

## ISSUES AND STANDARD OF REVIEW

¶26 Jessup and Kristy now appeal, but their appeal is limited. In particular, they do not appeal the district court's decision to deny their Motion for Relief, or its decision declining to defer ruling on Defendants' summary judgment motion until further discovery could be had. Instead, they appeal only the court's original order granting the motion for summary judgment on anticipatory repudiation grounds. For their part, Defendants ask us to affirm the court's summary judgment order, either on that basis or on the alternative ground that Jessup and Kristy do not own the Property and that any lease was therefore invalid.

¶27 Summary judgment is appropriate "if the moving party shows that there is no genuine dispute as to any material fact and

---

4. This allegation was contained in an affidavit from Jessup, submitted for the first time in connection with Jessup and Kristy's Motion for Relief.

the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, courts examine "whether reasonable jurors, properly instructed, would be able to come to only one conclusion, or if they might come to different conclusions, thereby making summary judgment inappropriate." *Heslop v. Bear River Mutual Ins. Co.*, 2017 UT 5, ¶ 20, 390 P.3d 314 (quotation simplified). "We review a [district] court's legal conclusions and ultimate grant or denial of summary judgment for correctness, viewing the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Heartwood Home Health & Hospice LLC v. Huber*, 2020 UT App 13, ¶ 11, 459 P.3d 1060 (quotation simplified); *see also Salo v. Tyler*, 2018 UT 7, ¶ 30, 417 P.3d 581 (stating that summary judgment is warranted when "no reasonable factfinder could rule in the nonmoving party's favor").

ANALYSIS

¶28 We first address Jessup and Kristy's challenge to the district court's determination that, as a matter of law and undisputed fact, Jessup and Kristy repudiated the lease. Because we conclude, for the reasons discussed, that the district court erred in granting summary judgment on that basis, we then discuss Five Star's request that we nevertheless affirm the court's entry of summary judgment on an alternative basis, namely, that Jessup and Kristy did not own the Property and therefore the lease was never valid.

I

¶29 In assessing Jessup and Kristy's challenge to the district court's summary judgment order, we begin by discussing the procedural parameters governing that challenge, and then transition into a discussion of the merits of that challenge.

A

¶30    With regard to procedure, we first note that "the fact statements of the moving and opposing memoranda constitute the constellation of facts to be considered by the district court on summary judgment," and that "[t]hose same facts are to be considered by the reviewing court on appeal." *Warrick v. Property Reserve Inc.*, 2018 UT App 197, ¶ 9, 437 P.3d 439. Accordingly, a factual assertion not introduced to the district court during the summary judgment proceedings may not be considered by an appellate court in reviewing the propriety of a summary judgment order. *See id.* ¶ 10 n.3 (stating that "the existence of a fact somewhere in the record does not absolve a party from its duty to include that fact in its summary judgment memorandum"). And while a nonmovant has the ability to controvert a movant's factual statement "by presenting to the district court contrary inferences to be made from the objective facts," to do so properly the nonmovant "is required to specifically state the inference to be made." *See USA Power, LLC v. PacifiCorp*, 2010 UT 31, ¶¶ 35, 38 n.6, 235 P.3d 749.

¶31    Second, in order to preserve legal theories for our review, a party resisting an opponent's motion must articulate those theories for the district court. *See Freight Tec Mgmt. Group Inc. v. Chemex Inc.*, 2021 UT App 92, ¶¶ 36–37, 499 P.3d 894; *see also id.* ¶ 37 (noting that the nonmovant "did not preserve its challenges to the summary judgment rulings because it did not oppose [the movant's] motion for summary judgment and, therefore, did not bring arguments to adjudicate its respective rights and obligations" (quotation simplified)); *True v. Utah Dep't of Transp.*, 2018 UT App 86, ¶ 32, 427 P.3d 338 (stating, in the context of reviewing the propriety of a summary judgment order, that a nonmovant's "argument based upon an entirely distinct legal theory is a new claim or issue and must be separately preserved" (quotation simplified)). The fact that the court makes a ruling on

the overarching summary judgment issue does not, by itself, preserve unmentioned theories of opposition for our review.

¶32    In considering the merits of Jessup and Kristy's appellate challenge, then, we may not consider any new facts or legal theories brought to the district court's attention for the first time during the proceedings concerning the Motion for Relief. We must, instead, view the propriety of the court's summary judgment ruling through the lens of what was presented to that court in connection with the summary judgment motion, addressing only the facts and legal theories that were "presented to the district court in such a way that the court ha[d] an opportunity to rule on [them]." *Freight Tec*, 2021 UT App 92, ¶ 36 (quotation simplified).

¶33    During briefing on Defendants' summary judgment motion, Jessup and Kristy made no effort to resist Defendants' legal argument that the 2018 email exchange constituted an anticipatory repudiation of the lease. During oral argument on the motion, Jessup and Kristy did—for the first time—articulate resistance to Defendants' repudiation theory. While the tactic of raising a new legal theory at oral argument before the district court[5] is certainly discouraged, such a maneuver is generally sufficient to preserve the theory for appellate review, at least so long as there is no indication—and there is no such indication here—that the party purposely delayed raising the issue in an effort to gain a tactical advantage. *See Warne v. Warne*, 2012 UT 13, ¶¶ 17–22, 275 P.3d 238. But even in such cases, the theory stands framed, for appellate review, as the parties presented it to the

---

5. The rule is different with regard to legal theories raised for the first time at oral argument before this court. We will not consider theories omitted from a party's appellate briefs but articulated to us for the first time at oral argument. *See, e.g.*, *Porenta v. Porenta*, 2017 UT 78, ¶ 33, 416 P.3d 487 ("We do not address issues raised for the first time during oral argument.").

district court. Thus, in assessing the propriety of a district court's summary judgment ruling, we may not consider additional facts or context presented to the court only later, in connection with (for instance) post-judgment motions.

¶34    In this case, Defendants certainly placed at issue the 2018 email exchange and asked the district court to interpret those emails as an anticipatory repudiation, on the part of Jessup and Kristy, of the 2015 lease. In evaluating the court's interpretation of those emails, we may consider the legal theory Jessup and Kristy articulated, at oral argument before that court, in opposition to Defendants' position. And we may consider the presence of the sublease, at least insofar as the sublease was briefly mentioned by Jessup and Kristy's counsel during the district court oral argument. But we may not consider, for instance, Jessup and Kristy's assertion—made for the first time during briefing on the post-judgment Motion for Relief—that they attempted to respond to the final email in the 2018 email exchange, through telephonic or other means. And other than the sublease, we may not consider other aspects of the parties' post-2018 "continued performance" asserted now on appeal, which were mentioned for the first time in connection with the Motion for Relief.

B

¶35    With these procedural parameters in mind, we turn to the substance of Jessup and Kristy's appellate challenge to the district court's determination that they repudiated the lease.

¶36    "An anticipatory breach occurs when a party to an executory contract manifests a positive and unequivocal intent not to render performance when the time fixed for performance is due." *Kasco Services Corp. v. Benson*, 831 P.2d 86, 89 (Utah 1992); *see also Smargon v. Grand Lodge Partners, LLC*, 2012 UT App 305, ¶ 18, 288 P.3d 1063 ("Repudiation of a contract gives rise to a claim for

total breach." (quotation simplified).[6] In most cases, in order for anticipatory breach to occur, "the repudiating party must have communicated, by word or conduct, unequivocally, unconditionally, and positively, its intention not to perform." 13 Richard A. Lord, *Williston on Contracts* § 39:37 (4th ed. 2021); *see also* Restatement (Second) of Contracts § 250 cmt. b (Am. L. Inst. 1981) ("In order to constitute a repudiation, a party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform."); 17B C.J.S. *Contracts* § 716 (2022) ("A party anticipatorily repudiates a contract when the party provides a positive and unequivocal manifestation that the party will not perform when a duty to perform arises.").

¶37 There are some circumstances, however, in which a party's conduct "is not sufficiently positive to amount to a repudiation"

---

6. Utah cases have sometimes linked the terms "anticipatory breach" and "repudiation." *See, e.g.*, *Upland Indus. Corp. v. Pacific Gamble Robinson Co.*, 684 P.2d 638, 643 (Utah 1984) (referring to "an anticipatory breach or repudiation of the lease agreement"); *Koulis v. Standard Oil Co. of Cal.*, 746 P.2d 1182, 1186 (Utah Ct. App. 1987) ("A cause of action does not accrue upon an anticipatory breach or repudiation of a contract."). Other jurisdictions have done the same. *See, e.g.*, *Combs v. International Ins. Co.*, 354 F.3d 568, 599 n.16 (6th Cir. 2004) ("The phrases 'anticipatory breach,' 'anticipatory repudiation,' and 'renunciation' are used interchangeably."); *see generally Breach of Contract*, Black's Law Dictionary (11th ed. 2019) (the term "anticipatory breach" is "[a]lso termed *breach by anticipatory repudiation*; *breach by renunciation*; *constructive breach*"); 23 Richard A. Lord, *Williston on Contracts* § 63:32 (4th ed. 2021) (using "anticipatory repudiation" and "anticipatory breach" synonymously). And because the parties here have not asserted that there is any difference between "anticipatory breach" and "repudiation," either generally or in the context of this case, we use the terms interchangeably as well.

under the usual standard, but it is enough to give the other party "reasonable grounds" to believe that it will breach by non-performance. *See* Restatement (Second) of Contracts § 251 cmt. c. In such circumstances, a different branch of the repudiation doctrine comes into play. The Restatement formulates the rule applicable in these situations as follows:

> (1) Where reasonable grounds arise to believe that the obligor will commit a breach by non-performance that would of itself give the obligee a claim for damages for total breach . . . , the obligee may demand adequate assurance of due performance and may, if reasonable, suspend any performance for which he has not already received the agreed exchange until he receives such assurance.

> (2) The obligee may treat as a repudiation the obligor's failure to provide within a reasonable time such assurance of due performance as is adequate in the circumstances of the particular case.

*Id.* § 251. Utah appellate courts have adopted and applied this branch of the repudiation doctrine. *See, e.g.*, *Bitzes v. Sunset Oaks, Inc.*, 649 P.2d 66, 70 (Utah 1982); *Smargon*, 2012 UT App 305, ¶ 18. Thus, under Utah law, if one party has reasonable grounds to believe that the other party does not intend to perform its obligations, and asks for adequate assurance of performance but receives no (or an inadequate) response, the opposing party will be deemed to have repudiated the contract.

¶38 The district court's conclusion that Jessup and Kristy had, as a matter of law, repudiated the lease was grounded in this branch of the anticipatory repudiation doctrine. Thus, in evaluating the propriety of the court's order, we must examine

two questions: (1) whether Five Star had reasonable grounds to believe that Jessup and Kristy intended to repudiate the lease and (2) if so, whether Jessup and Kristy failed to give Five Star adequate assurance that they intended to perform. We agree with Defendants and the district court that, as a matter of law, Five Star had reasonable grounds to seek adequate assurance. But we disagree that, as a matter of law, Jessup and Kristy failed to provide adequate assurance of their intent to perform. On that second question, a reasonable factfinder could, on this record, reach the opposite conclusion. Accordingly, summary judgment on that question is inappropriate.

1

¶39    Defendants assert that—based on the 2018 email exchange—Five Star had reasonable grounds to believe that Jessup and Kristy did not intend to perform their obligations under the 2015 lease. Jessup and Kristy respond by asserting that their emails could be read in a completely different way, one that does not betray any intent to repudiate the lease. We agree with Jessup and Kristy that their reading of the emails is a reasonable one, and that the email exchange is therefore ambiguous. But we disagree with Jessup and Kristy about the effect of that conclusion: in this specific context, the presence of ambiguity means that, as a matter of law, Five Star had reasonable grounds to seek adequate assurance.

¶40    We begin our analysis by reaching the rather unremarkable conclusion that both parties' interpretations of the 2018 email exchange are reasonable. Defendants view those emails as clearly indicative of an intent on the part of Jessup and Kristy to repudiate the lease. The district court agreed, noting that Jessup and Kristy "denied ever signing" the Base Lease, "indicated that their failure to do so was intentional," "expressed their belief that they [were] not bound by it, and proposed a new agreement." Even Jessup and Kristy's own lawyer acknowledged, at oral

argument before the district court, that the 2018 emails were "not the most clear" and that, in some ways, they "sound . . . like we're saying we don't agree to the lease." And on appeal, Jessup and Kristy do not seriously argue that Defendants' interpretation of the emails is unreasonable.

¶41 They do, however, assert that the emails can reasonably be read in a different way. They acknowledge that they never signed the Base Lease, because they thought that it contained too many "errors and inconsistencies." But they point out that they did sign Addendum 2, which by its terms "incorporated" all the terms of the Base Lease that were not modified by Addendum 2's additional language; indeed, Addendum 2 specifically provided that "[a]ll other terms of the Lease not modified shall remain the same." In their view, their signatures on Addendum 2—which they never attempted to disavow—indicated that there *was* a binding agreement between the parties, one comprised of the Base Lease plus any alterations made by Addendum 2. They thus assert that their unwillingness to sign the Base Lease should not be viewed as a disavowal of the terms of the lease, or as an indication that they did not intend to comply with its terms going forward. We agree with Jessup and Kristy that their emails can reasonably be read this way. And we agree that the existence of two reasonable interpretations means that their 2018 email responses are ambiguous. *See Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 24, 367 P.3d 994 (stating that ambiguity exists where "terms are capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies" (quotation simplified)).

¶42 In many situations, a court's legal determination that ambiguity exists within a text leads to the conclusion that summary judgment cannot be granted, and that a factfinder will need to weigh in on the matter. *See, e.g., Ocean 18 LLC v. Overage Refund Specialists LLC (In re Excess Proceeds from Foreclosure of 1107 Snowberry St.)*, 2020 UT App 54, ¶ 29, 474 P.3d 481 ("If a court

determines, as a legal matter, that a contract is facially ambiguous, then a question of fact exists as to the parties' intentions."). But in other specific areas of the law—those where clarity between parties is itself at issue—the presence of ambiguity cuts the other way, and suggests that a party may be entitled to judgment as a matter of law. *See, e.g., Glenn v. Reese*, 2009 UT 80, ¶ 19, 225 P.3d 185 ("Ambiguous conduct and language intended to signal contract termination will be deemed not to have terminated the contract." (quotation simplified)); *Geisdorf v. Doughty*, 972 P.2d 67, 70 (Utah 1998) (stating that when an "optionee decides to exercise his option [to renew a contract] he must act unconditionally and precisely according to the terms of the option," and that actions constituting mere substantial compliance—as opposed to strict compliance—will not suffice (quotation simplified)); *Error v. Benaroya*, 2022 UT App 31, ¶ 8, 508 P.3d 135 (stating that, "when the terms of the contract are ambiguous about the application of compound interest, such ambiguity . . . necessarily means, as a matter of law, that the contract provides for only simple interest").

¶43 The "reasonable grounds" inquiry in this case presents one of those instances. Regardless of whether Jessup and Kristy's interpretation of the 2018 emails is a reasonable one, Five Star had—by definition—"reasonable grounds" to seek adequate assurance so long as *its* interpretation of the 2018 emails was a reasonable one. *See* Restatement (Second) of Contracts § 251(1). And as noted, Five Star's interpretation is reasonable. After reviewing those emails, Five Star had reasonable grounds to believe that Jessup and Kristy were repudiating the terms of the lease. The fact that it was not certain of this, and that there existed another possible interpretation of the emails, does nothing to take away from the reasonableness of Five Star's belief.

¶44 For these reasons, the district court correctly concluded that, as a matter of law and undisputed fact, Five Star had reasonable grounds to believe that Jessup and Kristy intended to repudiate the lease, and therefore had the right to seek

adequate assurance from Jessup and Kristy that they intended to perform. On remand, this issue should be considered settled, and should not be the subject of any further litigation, at trial or otherwise.

2

¶45 Because we have concluded that Five Star did indeed have reasonable grounds to believe that Jessup and Kristy intended to repudiate the lease, we must address the other question: whether Jessup and Kristy provided Five Star with adequate assurance that they intended to perform. On this issue, the ambiguity in Jessup and Kristy's email responses cuts the other way, and we agree with Jessup and Kristy that genuine issues of material fact preclude the entry of summary judgment in Defendants' favor.

¶46 Jessup and Kristy assert that their May 2018 emails—in particular the one they sent at 4:09 p.m.—provided adequate assurance to Five Star that they intended to perform under the terms of the lease, as modified by Addendum 2. At least, they assert, a reasonable jury could interpret their emails that way. And they contend that their silence following Jones's final email in the chain should not be held against them, at least not if their 4:09 email is interpreted in the way they urge.[7] After all, they claim they had already provided adequate assurance in the earlier emails, and were therefore under no obligation to provide the same assurance a second time.

¶47 For the reasons just discussed, we agree with Jessup and Kristy that a reasonable factfinder could read their emails in the

---

7. For purposes of our analysis, we do not consider any of the evidence Jessup and Kristy presented for the first time in connection with the Motion for Relief, and we presume that they did indeed give no response to Jones's last email.

manner they advance. And that alone is sufficient to defeat Defendants' summary judgment motion on this point.[8]

¶48     In this context—as opposed to the context in which we examine whether Five Star had reasonable grounds to seek assurance—the existence of ambiguity applies in its traditional sense, and cuts against the entry of summary judgment. *See, e.g.*, *Ocean 18 LLC*, 2020 UT App 54, ¶ 29 ("If a court determines, as a legal matter, that a contract is facially ambiguous, then a question of fact exists as to the parties' intentions."). It will be up to a factfinder to interpret the 2018 emails and determine whether those emails do, or do not, constitute adequate assurance on the part of Jessup and Kristy that they intended to perform under the lease. That factfinder may well conclude that Jessup and Kristy failed to provide adequate assurance. But a reasonable factfinder, on the summary judgment record presented to the district court, could also reach the opposite conclusion. And on that basis, we reverse the district court's entry of summary judgment on the

---

8. Jessup and Kristy also point to the parties' "continued performance" under the lease, from 2018 through 2020, as additional support for their contention that they provided adequate assurance. But this does not factor into our analysis. Evidence of continued lease payments could be interpreted to support either Defendants' theory—that the parties were operating on a month-to-month tenancy—or Jessup and Kristy's assertion that they did not repudiate the lease. The only other specific item of "continued performance" contained in the summary judgment record is the sublease, but the fact that Five Star—in the absence of any new lease agreement and during a time period in which it apparently believed it was making "interim" payments—agreed to sublease the premises to another entity on the same or similar terms as those set out in the 2015 lease does not tell us very much about whether the underlying lease was still effective.

repudiation issue, and remand for further proceedings with regard to the "adequate assurance" question.

II

¶49 Given our conclusion that the district court incorrectly entered summary judgment in Defendants' favor on the repudiation issue, we proceed to examine Defendants' request that we affirm the court's summary judgment order on an alternative ground: that Jessup and Kristy did not own the Property in their individual capacities, and therefore could not have validly leased it to Five Star. For two reasons, we decline Defendants' invitation to affirm on this alternative ground. First, we conclude that the record presented to us is not sufficiently clear to support affirmance on the proffered alternative ground. And second, we take note of the district court's inclination—stated in its summary judgment order—that, if necessary, it would have been inclined to give Jessup and Kristy an opportunity to bring the Trusts into the litigation as the real parties in interest. This second issue has not been sufficiently explored in the briefing on appeal, and provides an additional basis for our discomfort with Defendants' request for affirmance on this alternative ground.

A

¶50 "A trust is a form of ownership in which the legal title to property is vested in a trustee, who has equitable duties to hold and manage it for the benefit of the beneficiaries." *Continental Bank & Trust Co. v. Country Club Mobile Estates, Ltd.*, 632 P.2d 869, 872 (Utah 1981). A trustee therefore "has exclusive control of the trust property, subject only to the limitations imposed by law or the trust instrument." *Id.* After a settlor creates a trust and conveys property into that trust, "he is no longer the owner of the trust property and has only such ability to deal with it as is expressly reserved to him in the trust instrument." *Id.*

¶51    In *Continental Bank*, a property owner leased his property to a tenant for a fifty-year term, and gave that tenant an option to purchase the property at any time during the first eleven years of the lease's term. *See id.* at 870–71. In the ninth year of the lease term, the owner, as settlor, "conveyed the subject property to the trustee in trust for various members of his family, signing a trust agreement and conveying the property to the trustee by a warranty deed." *Id.* at 871. The trust was revocable, with the settlor reserving for himself "the right to revoke the trust." *Id.* More than two years later, as the eleven-year option period was about to expire, the settlor—without consulting or obtaining the approval of the trustee—"signed an instrument purporting to grant the [tenant] another five-year extension of its option." *Id.* After learning what the settlor had done, the trustee brought suit against the tenant "to quiet title" and "to determine the validity of the attempted extension of the option." *Id.* The district court ruled in favor of the tenant (and the settlor) and declared the option extension valid. *Id.*

¶52    On appeal, our supreme court reversed. *Id.* at 872. The court examined the language of the trust instrument, in which the settlor reserved to himself "the power to direct the trustee, in writing, . . . to retain, sell, exchange or lease any property of the trust estate." *Id.* at 871 (quotation simplified). But the court determined that, on the facts before it, the settlor had acted in contravention of those broadly stated powers because he had acted unilaterally and had not actually "direct[ed]" the trustee to do anything. *Id.* ("We are unable to find an exercise of the 'power to direct the trustee, in writing,' in an act that was not intended to communicate and did not in fact communicate anything to the trustee."). As the court saw it, this was "a case where a settlor created a trust and then chose to ignore it." *Id.* at 872. The court acknowledged the settlor's broad reserved powers, noting that the settlor "could have modified or revoked the trust, or directed the trustee in writing to sell or lease the trust property," but

observed that the settlor "took neither of these actions." *Id.* The court also acknowledged the reality that the settlor had originally owned the property and that he retained broad powers related to it, but noted that "[e]ven a revocable trust clothes beneficiaries, for the duration of the trust, with a legally enforceable right to insist that the terms of the trust be adhered to," and concluded that, if it blessed the settlor's actions, it "would prejudice the interests of the beneficiaries, blur some fundamental principles of trust law, and cast doubt upon whether it is the trustee or the settlor who is empowered to manage and dispose of the trust property in a valid revocable trust." *Id.* On that basis, the court reversed the ruling of the district court and declared the settlor's unauthorized actions invalid. *Id.*

¶53    In *Continental Bank*, the settlor and the trustee were not the same individual. *Id.* at 871. But even where the settlor and the trustee are the same person, some courts have held that trust formalities must be observed. *See, e.g., Shaffer v. Tewes*, 466 F. Supp. 3d 980, 990 (N.D. Iowa 2020); *Nuell, Inc. v. Marsillet*, 164 N.E.3d 768, 775 (Ind. Ct. App. 2021).[9] In *Shaffer*, for instance, the court construed essentially the same trust language as was at issue in *Continental Bank*: language by which the settlor reserved for herself the power "[t]o direct in writing the retention, purchase, sale or transfer of property of the trust." *See* 466 F. Supp. 3d at 989–90 (quotation simplified). In that case, the settlor purported to lease the property to a tenant, but did so in her individual capacity. *Id.* at 985. There was no evidence in the case that the settlor, in her individual capacity, had ever instructed herself, in

---

9. Courts in some other jurisdictions have held otherwise. *See, e.g., Galdjie v. Darwish*, 7 Cal. Rptr. 3d 178, 192 (Ct. App. 2003). But we find the analysis of these cases less persuasive than the analysis set forth in *Shaffer*, as well as not in keeping with our supreme court's analysis in *Continental Bank*, which emphasized the importance of adhering to the terms of the trust instrument.

her capacity as trustee, to convey or lease the property. *Id.* at 991. The court acknowledged that, "where the settlor who retains the right to transfer property is also the trustee," the distinction between individual and trustee "appears frivolous and it may seem unnecessary to require [the settlor] to direct herself in writing about whether to convey the property." *Id.* at 990. But the court nevertheless held the settlor's actions invalid, noting that "trust formalities are important," and that "[i]n exchange for receiving the benefits of a trust, a settlor is expected to follow specific procedures that are designed to define and distinguish property and rights." *Id.*

¶54 From these cases, we distill the legal principle that a settlor in possession of powers to direct the trustee to sell (or otherwise encumber or convey) trust property may not act unilaterally, in an individual capacity, but must instead actually direct the trustee to do so, even if the settlor and the trustee are the same person.[10] It may be that, at some point in the future, this legal principle will

---

10. We therefore disagree with the district court's conclusion that, simply because the Trusts were revocable, Jessup and Kristy, as settlors, could act unilaterally in their individual capacities to remove property from the Trusts. The extent of their authority will depend on the precise language of the trust instruments, and not just on the status of the Trusts as revocable. In this context, we find the district court's reliance on *Pandy v. Independent Bank*, 2016 CO 49, 372 P.3d 1047, misplaced. In that case, the court held that creditors of the settlor could access assets placed by the settlor in a revocable trust. *Id.* ¶¶ 18–21. But the fact that a settlor's creditors can access property held in a revocable trust—a fact established in Utah by statute, *see* Utah Code Ann. § 75-7-505(1) (LexisNexis Supp. 2021) ("During the lifetime of the settlor, the property of a revocable trust is subject to the claims of the settlor's creditors.")—does not tell us very much about the scope of a settlor's powers under specific trust documents.

be of some use to Defendants in defending against Jessup and Kristy's lawsuit. But on the record before us, we are unable to affirm the district court's summary judgment order on the basis of this legal principle.

¶55     As an initial matter, the trust documents themselves are not in the record, and we therefore do not know whether Jessup and Kristy enjoyed the same, broader, or narrower powers as the settlors did in *Continental Bank* and *Shaffer*. Defendants assert that it was Jessup and Kristy's responsibility to put the trust documents in the record, and that their absence should be laid at the feet of Jessup and Kristy and not at Defendants'. But Defendants ask us to affirm the district court's summary judgment order on an alternative ground, something we are able to do only when the record clearly supports such a result. *See Olguin v. Anderson*, 2019 UT 73, ¶ 20, 456 P.3d 760 (stating that "it is within our discretion to affirm a judgment on an alternative ground if it is apparent in the record," and that "for a legal theory to be apparent on the record, the record must contain sufficient and uncontroverted evidence supporting the ground or theory to place a person of ordinary intelligence on notice that the prevailing party may rely thereon on appeal" (quotation simplified)).[11] In our view, it is not "apparent in the record" before us that Jessup and Kristy acted beyond the scope of their authority as settlors under the Trusts.

¶56     Moreover, the sequence of events is different in this case than it was in *Continental Bank* and *Shaffer*, and that might matter here, depending on facts not apparent in the record before us. In

---

11. Even when the record is clear enough to allow us to affirm on an alternative ground, our decision to do so remains entirely discretionary. *See Croft v. Morgan County*, 2021 UT 46, ¶ 43, 496 P.3d 83 (stating that an appellate court's decision to affirm on an alternate ground "is wholly discretionary, even if an alternate ground presents a question purely of law").

both of those cases, the property had been conveyed into the relevant trust *before* the allegedly ultra vires action on the part of the settlor. *See Shaffer*, 466 F. Supp. 3d at 984–85; *Continental Bank*, 632 P.2d at 870–71. But here, by contrast, Jessup and Kristy entered into the lease several months before the Property was apparently conveyed to the Trusts. Ordinarily, a tenant does not lose its rights under a lease simply because the landlord conveyed the property to someone else during the lease term; rather, the new owner typically takes the property subject to the leasehold interest of the tenant. *See* 52 C.J.S. *Landlord & Tenant* § 525 (2022) (stating that "[t]he owner of leased property may sell or assign it during the continuance of the lease," and that in such situations "[t]he vendee becomes the landlord by operation of law, and the tenant becomes a tenant of the grantee of the reversion"); *see also Otey v. Wiley*, 519 S.W.3d 515, 519 (Mo. Ct. App. 2017) ("The legal premise that a successor in interest is bound by the terms of an existing lease is not new."). Thus, if Jessup and Kristy conveyed the Property into the Trusts after the 2015 lease was already in effect, that conveyance would likely have no effect on the validity of the lease. And we know, from the record before us, that the lease was entered into no later than October 12, 2015, at least several weeks before the record indicates any involvement on the part of the Trusts.

¶57 Indeed, the lease itself indicates that it would be valid only "if Holden Jessup and Mike Kristy (or their assigns) purchase[d] the [Property] before January 1, 2016." If Jessup and Kristy, in their individual capacities, completed that purchase, that requirement would appear to be met, even if Jessup and Kristy then immediately conveyed the Property to the Trusts. Stated another way, if Jessup and Kristy owned the Property in their personal capacities even momentarily, they would have a good argument that the lease provision was satisfied and the lease was therefore valid, and they would then be free—under the general principles expressed above—to convey the Property to the Trusts

without fear of invalidating the lease. And as already noted, very few of the documents associated with the closing of the real estate transaction are in the record. To be sure, the warranty deed—conveying the Property directly from Canuck to the Trusts—indicates that the Property was never in the possession of Jessup and Kristy personally, even momentarily. But both parties, in describing the transaction, indicate that Jessup and Kristy "purchased the Property" in their individual capacities and then "asked that the [P]roperty be titled" in the Trusts. Taking that description at face value, we find it difficult to conclude that grounds for affirmance on an alternative ground are apparent in the record submitted to us on appeal.

B

¶58 Second, even aside from the gaps in the record submitted to us, we find an additional reason for caution in the district court's comments, expressed in its summary judgment order and referencing rule 17(a) of the Utah Rules of Civil Procedure, that even if there existed some standing-related problem with Jessup and Kristy suing Defendants in their individual capacities rather than as trustees of the Trusts, the court would be inclined to grant them "a reasonable time to comply with the requirement that the action be prosecuted in the name of the real party in interest." The parties have not sufficiently briefed the question of whether the issues Defendants identify may be cured by resort to rule 17(a); indeed, Five Star—the party asking us to affirm on an alternative basis—does not mention the issue at all in its brief. And we express no opinion on the question. But without further briefing and argument around these issues, we are not comfortable affirming the district court's summary judgment order on the alternative ground advanced by Defendants.

¶59 Thus, for both of these reasons, we decline Defendants' invitation to affirm the district court's summary judgment order

on alternative grounds.[12] Defendants are, of course, free to explore these issues further in additional proceedings on remand.


CONCLUSION

¶60     Five Star had reasonable grounds, as a matter of law, to believe that Jessup and Kristy intended to repudiate the 2015 lease. But factual questions remain as to whether Jessup and Kristy gave Five Star adequate assurance that they intended to perform under the lease. For that reason, the district court erred in concluding, as a matter of law, that Jessup and Kristy repudiated the lease. And we decline Defendants' invitation to affirm the district court's summary judgment ruling on alternative grounds. Accordingly, we reverse the district court's grant of summary judgment and remand this case for further proceedings consistent with this opinion.

———————

12. In addition, neither party made any effort, either before the district court or here on appeal, to discuss the "general rule" that "a tenant is estopped to deny, challenge, or dispute the landlord's title" to the leased property. *See* 49 Am. Jur. 2d *Landlord & Tenant* § 733 (2022) (quotation simplified); *see also, e.g., Air-Ag, Inc. v. F & H Santa Fe Rail, Inc.*, 22 S.W.3d 596, 598 (Tex. App. 2000) (discussing the "general, well-established rule . . . that a tenant cannot dispute its landlord's title while in possession under that landlord," and stating that "a tenant is estopped to deny its landlord's title . . . , and it is immaterial whether the landlord had title at the time the lease was entered"). We offer no opinion on whether this general rule has any application here, but our awareness of its existence provides us a third reason for discomfort with Defendants' request for affirmance on this alternative ground.